FRED B. SNITE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

LORETTO M. SNITE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 12767, 12768. Promulgated March 25, 1948.

*Joseph E. Newton, Esq., John E. Shea, Esq.,* and *George E. McMurray, Jr., Esq.,* for the petitioners.

*H. H. Hart, Esq.,* for the respondent.

526

### OPINION.

ARUNDELL, *Judge*: Initially we are met with the petitioners' contention that in determining the deficiencies the respondent was barred by the statute of limitations, section 275 (a), Internal Revenue Code, from making any adjustments to their 1942 income, inasmuch as the deficiency notices were mailed more than three years after their 1942 returns were filed. The question involves the interrelationship of the statute of limitations and the forgiveness features of section 6 of the Current Tax Payment Act of 1943. Admittedly the deficiency notices were mailed within three years after the filing of the 1943 returns. Since the briefs in this case were received, this Court has decided an identical question adversely to the position of the petitioners. *Lawrence W. Carpenter*, 10 T. C. 64. In these circumstances, further discussion of this issue is unnecessary and, on the authority of that case, we hold that the respondent was not barred from making adjustments to the petitioners' 1942 income in determining the deficiencies for 1943.

We pass, therefore, to the main question at issue, which is whether the stock transactions between the petitioners and Local Loan Co. in 1942 and 1943 were, as they purported to be, sales, or were cancellations or redemptions of stock at such times and in such manner as to be essentially equivalent to the distribution of taxable dividends under section 115 (g) of the code.[1] Petitioners' first argument as to why section 115 (g) is not applicable is that here there was no cancellation or redemption of stock. It is clear enough that the stock was not actually canceled or retired, nor was it intended to be. Whether it was redeemed may be a different question. Petitioners recognize that in certain decisions, such as *Abraham Kirschenbaum*, T. C. memorandum opinion, March 27, 1945; affd., 155 Fed. (2d) 23; and *James D. Robinson*, 27 B. T. A. 1018; affd., 69 Fed. (2d) 972, section 115 (g) has been held applicable even though the stock was held in the corporate treasury; but they contend that these cases are distinguishable because of the "patent tax evasion" schemes there involved. Be that as it may, in the view we take of this case we need not express any opinion as to whether every purchase by a corporation of its own stock amounts to a "redemption" as that term is used in section 115 (g). Cf. *Rollin C. Reynolds*, 44 B. T. A. 342.

Assuming that the stock transactions in this case were redemptions,

---

[1] SEC. 115. DISTRIBUTION BY CORPORATIONS.

    •      •      •      •      •      •

  (g) REDEMPTION OF STOCK.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

the question still remains whether they occurred at such times and in such manner as to be essentially equivalent to the distribution of taxable dividends. Respondent insists it is now established law that the net effect of the transaction, rather than the motives and purposes of the corporation or its stockholders, is the test of taxability. It must be recognized that the net effect rationale inheres in a number of decisions. See *Bazley* v. *Commissioner*, 331 U. S. 737; *Hirsch* v. *Commissioner*, 124 Fed. (2d) 24; *Flanagan* v. *Helvering*, 116 Fed. (2d) 937; *Hyman* v. *Helvering*, 71 Fed. (2d) 342; cf. *Commissioner* v. *Bedford's Estate*, 325 U. S. 283. But all that this means is that no one factor is controlling. It surely does not mean that the mere existence of sufficient earnings and profits to cover the acquisition of the stock automatically brings the transaction within the provisions of section 115 (g). If that were so, it would seem that practically no room would be left for the operation of the provisions of section 115 (c), relating to distributions in partial liquidation. Just as the presence of a legitimate business purpose will not, standing alone, conclusively determine that section 115 (g) is inapplicable, so the mere fact that the corporation has sufficient surplus available does not conclusively determine that the section is applicable. All relevant factors must be considered in determining the net effect of the transaction.

On brief, the respondent argues that the "real purpose of the transactions was to distribute earnings and profits of $525,000 to the Snites, and to do so under the guise of sales in order to avoid Federal income taxes." Implicit at least in this argument is a recognition by the respondent of the purpose of section 115 (g) and the background of tax avoidance which gave rise to that statute. We do not, however, agree with the respondent's view of the evidence in this case.

The record before us is overwhelmingly convincing that the initiative for the stock transactions in question came entirely from the employees of the Local Loan Co., who for many years had been striving to acquire a proprietary interest in the business, and that the only reason for the transfers was to make stock available to the employees. Griffin, the general manager, testified that in the early 1930's he had begun trying to persuade Snite to let him and other key employees acquire stock in the company, but was continually put off with an indefinite promise to work something out in the future. His drives for stock participation usually resulted in an increase in his salary. Finally, in 1942, after the salary control provisions of the Stabilization Act prevented further increases in salary, Griffin received a favorable offer from a competing company and was determined to force the issue on stock participation. It appears that Snite was very reluctant to agree either to the plan of stock participation or to the price of $150 a share, which was arrived at only after much bargaining between Snite and

the employees. It was the employees themselves who suggested that the transactions be handled through the company. That would facilitate the financing of their purchases and also the imposition of conditions relating to repurchase.

There was a definite understanding that the 2,000 shares which the petitioner sold the company in 1942 were to be made available, 1,000 shares each, to Griffin and Murphy. Other employees, upon learning of that transaction, were dissatisfied and also wanted to be included in the stock participation plan. It was to provide for them that the petitioners transferred the additional 1,500 shares in 1943. Though the Stabilization Act prevented the full fruition of the plan during the war years, as the employees realized, nevertheless the employees felt they had won their fight when the stock came into the hands of the company and they were assured that it would be available to them whenever the relaxation of wartime controls would permit.

The proceeds of the sales of petitioners' stock were in no sense a substitute for regular dividends which would otherwise have been payable. The dividend record of the company over its existence has been liberal, despite the fact that in the type of business in which the company engages cash capital is a vital element. In each of the taxable years the petitioners received on the stock they sold the company in that year the regular cash dividends which had been declared prior to the sales. No compelling personal need of either of the petitioners for funds—a factor to which great weight is usually attached in decisions holding section 115 (g) applicable—can successfully be argued on the basis of the instant record. On the contrary, in 1942 each of the petitioners returned to the company, by way of loans, substantial amounts of the proceeds of their stock sales; and in 1943 they both loaned the company even more money than the proceeds they received. If there was need for funds, it would appear to have been on the part of the company rather than the petitioners.

The petitioners parted with their title to 3,500 shares of stock, representing 10 per cent of the total outstanding shares; and those 3,500 shares are irrevocably optioned to the several employees of the Local Loan Co., whose interests may well be adverse to those of the petitioners as stockholders. The petitioners' proportionate ownership has been substantially changed. These results, it is obvious, could never follow from the distribution of an ordinary taxable dividend; nor could the distribution of such a dividend in any way accomplish the purpose of making the stock available to satisfy the insistent demands of the employees.

In our opinion, the various factors present in this record add up to the conclusion that the stock transactions in question did not have the net effect of a dividend. They were, as the petitioners reported

them, sales of capital assets. We hold that the transactions did not occur at such times and in such manner as to be essentially equivalent to the distribution of taxable dividends.

*Decisions will be entered under Rule 50.*