Edward C. SMITH

v.

The UNITED STATES.

No. 50017.

United States Court of Claims.

May 3, 1955.

N. Barr Miller, Washington, D. C., J. Marvin Haynes, F. Eberhart Haynes, and Oscar L. Tyree, Washington, D. C., on the briefs, for plaintiff.

H. S. Fessenden, Washington, D. C., H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe and Ellis N. Slack, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

The plaintiff sues to recover individual income taxes and deficiency interest paid for the calendar year 1944 in the amount of $11,070.57, with interest thereon. The plaintiff duly filed his income tax return for 1944 and paid the tax shown thereon.

In July 1944, the Bay City Electric Steel Casting Company (sometimes hereinafter referred to as the company), in which the plaintiff was a stockholder, acquired from the plaintiff and other stockholders certain shares of its own outstanding stock. The plaintiff received $12,698.27, which was his cost basis, for 460¾ shares transferred by him to the company. These shares were held by the company as treasury shares and a majority of them were immediately optioned to the company's general manager in order to make it possible for him to acquire a one-third equity interest in the

company in accordance with a prior agreement at the time he was employed.

The Commissioner of Internal Revenue considered the transaction a cancellation or redemption of the company's stock at such time and in such manner as to make the distribution of the $12,698.27 and the cancellation or redemption essentially equivalent to the distribution of a taxable dividend to the plaintiff in 1944 under the terms of section 115(g) of the Internal Revenue Code of 1939, as amended, 26 U.S.C.A. § 115(g). The Commissioner included the $12,698.27 in the plaintiff's income for 1944, and assessed a deficiency in the amount of $8,669.39, with interest thereon in the amount of $2,401.18. The plaintiff paid the deficiency and interest totaling $11,070.57 on November 16, 1949. The plaintiff's claim for refund was rejected and suit was timely instituted in this court.

The undisputed facts as found by the commissioner of this court may be summarized as follows: The authorized capital stock of the Bay City Electric Steel Casting Company was 15,000 shares of common stock of a stated par value of $10 per share. On January 11, 1944, its outstanding capital stock consisted of 6,350 shares of common stock, of which none has been issued as a stock dividend. Prior to January 11, 1944, all the outstanding stock had been owned by Edward M. Mills and Lillian M. Mills. The plaintiff, who was president of another corporation, learned that Mr. Mills, who managed the company, desired to retire and sell the outstanding stock.

The plaintiff and his associates wanted to purchase the stock of the company but did not desire to undertake full-time management. They were not interested in purchasing the stock without first making arrangements for the employment of a capable general manager by the company. Consequently the plaintiff contacted Charles C. Keegan, who had an established reputation as a competent general manager in that line of business, to obtain his services as the general manager of the company. Keegan refused to take the position unless he could become the owner of one-third of the stock of the company. At that time Keegan was financially unable to raise one-third of the proposed purchase price of the stock.

On January 11, 1944, the plaintiff and his wife, Vera G. Smith, and William L. Mueller, and Laura L. Mueller, his wife, entered into an agreement to purchase the 6,350 outstanding shares of the company for $175,000, which was equivalent to approximately $27.56 per share. Upon execution of the agreement the plaintiff and his wife became joint owners of one-half of the stock and Mr. and Mrs. Mueller the joint owners of the other half.

On January 12, 1944, Keegan acquired 907 shares of the stock, which was approximately one-seventh of the 6,350 shares, purchasing 453½ from the plaintiff and his wife and 453½ from Mr. and Mrs. Mueller at the price of approximately $27.56 per share. It was orally agreed at that time that Keegan would be afforded an opportunity to acquire a one-third interest in the company if his services were satisfactory. Keegan became general manager of the company on that day and was also elected to the board of directors and to the office of the secretary-treasurer of the company. His compensation was 10 percent of the gross profit of the company before Federal income taxes, with certain other adjustments, but not less than $7,500 a year. On the same date the plaintiff, Mueller and Keegan, each borrowed $25,000 from the company on demand notes with interest at two percent. The $75,000 was used to pay Mr. and Mrs. Mills pursuant to the terms of the agreement of January 11, 1944. It was necessary for the plaintiff to borrow from some source to purchase the stock. Although he had substantial credit and might have borrowed funds elsewhere, he borrowed the $25,000 from the company because the rate of interest was lower and the company would benefit by the receipt of interest on its temporarily idle funds. On November 30, 1944, the plaintiff and Mueller paid off the balance due on their respective notes, and interest, and neither was substantially indebted to the company in 1945 or 1946. Keegan paid off the balance of his note of

$25,000, and interest, on December 27, 1945.

Keegan's services proved highly satisfactory and in July 1944, he insisted on a definite arrangement to allow him to gradually, over a period of time, acquire one-third of the outstanding stock, inasmuch as he was still financially unable to purchase the additional shares at that time.

At a board of directors meeting on July 18, 1944, it was resolved that the company would purchase 921½ shares from the plaintiff and his wife, 921½ shares from Mr. and Mrs. Mueller, and 307 shares from Keegan, at the price of $27.56 per share. It was further resolved that a 5-year option agreement be entered into between the company and Keegan offering Keegan the right to purchase up to 1,200 shares of the common stock of the company so that his total holdings would total, but not exceed, 1,800 shares, at a price of $27.56 per share plus two percent per annum from July 1, 1944. The directors also determined that since the plaintiff, Mueller and Keegan were indebted to the company in the respective amounts of $30,796.63, $30,664.67 and $25,231.53, the payments by the company for the shares of these stockholders should be applied to reduce their indebtedness to the company.

On July 19, 1944, the company pursuant to the resolution received the 2,150 shares and credited against the indebtedness of the plaintiff and his wife, $25,396.54, Mr. and Mrs. Mueller, $25,396.54, and Keegan, $8,460.92. On that date the 2,150 shares were issued to the company and it held these shares as treasury stock. On August 8, 1944, the company entered into a contract with Keegan wherein Keegan was given the option to purchase at any time within five years 1,200 shares of the treasury stock at $27.56 per share plus two percent per annum from July 1, 1944.

The operating machinery and equipment of the company were badly worn and in need of replacement. However, it was not possible during 1944 and 1945 to replace this worn machinery and equipment since it was not available because of the war conditions. It was therefore possible for the company to employ these temporarily idle funds in the stock transaction of January and July 1944, without interfering with its replacement operation.

Before the transaction the plaintiff and his wife jointly owned three-sevenths of the outstanding stock, Mr. and Mrs. Mueller three-sevenths, and Keegan one-seventh. The reason for the transaction was to temporarily reduce the number of shares owned by the plaintiff and his wife and the Muellers to 3,600 so that it would be possible for Keegan to obtain a one-third ownership interest by purchasing 1,800 shares instead of 2,116⅔ shares, that is, one-third of 6,350. It was not the intention of the company or its stockholders at the time of the acquisition of the 2,150 shares to reduce the capitalization of the company by cancellation of any of the acquired shares, but it was the company's intention to hold these shares as treasury stock pending the resale of 1,200 shares to Keegan, pursuant to his option, and the other 950 shares to the stockholders for the purpose of securing funds to acquire new machinery and equipment when it became available.

After the transaction the plaintiff and his wife jointly owned approximately two-sevenths of the outstanding stock, and the Muellers approximately two-sevenths. The company owned approximately two-sevenths, of which 1,200 shares were optioned to Keegan. Keegan owned approximately one-seventh and had an option to purchase 1,200 shares.

The net profits of the company after Federal taxes which were carried to its surplus for the years 1943 to 1948, inclusive, were as follows:

| Years | Amounts |
|-------|---------|
| 1943 | $22,555.03 |
| 1944 | 23,536.26 |
| 1945 | 25,108.12 |
| 1946 | 56,843.87 |
| 1947 | 54,740.04 |
| 1948 | 82,719.14 |

The earned surplus of the company at December 31, of the years 1943 through 1948, before the treasury stock, which was recorded at cost, was deducted from surplus, and after payment of dividends during the years 1946 and 1947, was as follows:

| Years | Amounts |
| --- | --- |
| 1943 | $80,032.49 |
| 1944 | 97,714.57 |
| 1945 | 121,361.15 |
| 1946 | 127,472.76 |
| 1947 | 140,045.56 |
| 1948 | 222,764.70 |

During the year 1946, cash dividends totaling $35,700 were declared and paid to the five stockholders, the plaintiff and his wife, Mr. and Mrs. Mueller, and Mr. Keegan. In 1947, cash dividends totaling $33,600 were declared and paid to these five stockholders. The record indicates that the plaintiff was not in need of funds. He had a taxable income of over $20,000 for the taxable year 1944.

About the end of 1945, Keegan discussed with the plaintiff the fact that he had not yet been financially able to acquire any of the optioned stock and expressed a wish that it could be made financially easier for him to acquire a one-third interest in the company. Up to that time it had been Keegan's intention to exercise the option when he became financially able to do so. The company's attorney was consulted and he suggested that if funds represented by the treasury stock were not immediately needed in the business, the sale of those shares could be postponed and Keegan might instead purchase enough additional shares from the other stockholders to make him the owner of one-third of the shares outstanding, exclusive of the treasury shares. Accordingly, in January 1946, Keegan purchased from the plaintiff and his wife 400 shares of stock of the company and a like number of shares from Mueller and his wife at $27.56 a share. Keegan borrowed $23,000 from the company on a two percent demand note to enable him to make the purchase. This transfer increased Keegan's stockholdings in the company to 1,400 shares and reduced the stockholdings of the plaintiff and his wife to 1,400 and of Mueller and his wife to 1,400. At the time of the above transaction, January 1946, the company did not have immediate need for cash in the amount at which the treasury stock was carried on its books, $59,254, since it had not been able to acquire the needed new machinery and equipment, nor did it appear that it would need such funds for some time to come. However, it was still expected that it would be necessary to resell the treasury stock when the new machinery and equipment were obtained. No such transfer as occurred in January 1946, was under consideration by the stockholders at any time during 1944 as a substitute for the option plan of July and August 1944. At all times material to this proceeding, the plaintiff and his wife, and Mueller and his wife, were financially able to repurchase the treasury shares whenever the company had need for cash.

The company acquired new machinery and equipment of approximately $27,000 during 1946, $23,000 during 1947, and $115,000 during 1948. These acquisitions were financed by the company without the resale of the treasury stock and without the issuance of any additional stocks or bonds.

The plaintiff contends that the facts in this case demonstrate that the company purchased the shares and held them throughout 1944 for the legitimate business purpose of resale to Keegan and the other stockholders in order to satisfy Keegan's demands. The plaintiff contends that since the shares were purchased and held for resale there was no cancellation or redemption of the shares within the meaning of section 115(g), and further that there was no distribution in 1944 of earnings or profits essentially equivalent to a dividend.

The defendant contends that the facts show there was a pro rata redemption of the capital stock of the company which

constituted a distribution essentially equivalent to a taxable dividend.

Section 115 (g) provides:

"*Redemption of stock.* * * * If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend."

The pertinent regulation is set forth below.[1]

The provision that the cancellation or redemption by a corporation of its stock in such a manner as to make the distribution essentially equivalent to a taxable dividend first made its appearance as section 201(d) of the Revenue Act of 1921, 42 Stat. 227. The legislative history of this provision and its amendments, and section 115(c) and its amendments (which section deals with partial liquidations), and section 302 of the 1954 Code, 26 U.S.C.A., displays a design to impose a tax at the ordinary income tax rates on dividend distributions from earnings or profits regardless of whether or not the dividend distribution is disguised as a sale or partial liquidation. It was not intended to cover bona fide sales or bona fide partial liquidations which may have the same effect on the profits but not the same effect on the corporation and its stockholders.[2]

This court stated in Stein v. United States, 62 F.Supp. 568, 104 Ct.Cl. 446, that the terms of the statute make the question under section 115(g) one of equivalence. If the distribution is essentially equivalent to the distribution of a taxable dividend section 115(g) is applicable. Commissioner of Internal Revenue v. Sullivan, 5 Cir., 210 F.2d 607.

---

1. Treasury Regulations 111.

"Sec. 29.115-9. *Distribution in redemption or cancellation of stock taxable as a dividend.*—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

"The question whether a distribution in connection with a cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend depends upon the circumstances of each case. A cancellation or redemption by a corporation of a portion of its stock pro rata among all the shareholders will generally be considered as effecting a distribution essentially equivalent to a dividend distribution to the extent of the earnings and profits accumulated after February 28, 1913. On the other hand, a cancellation or redemption by a corporation of all of the stock of a particular shareholder, so that the shareholder ceases to be interested in the affairs of the corporation, does not effect a distribution of a taxable dividend. A bona fide distribution in complete cancellation or redemption of all of the stock of a corporation, or one of a series of bona fide distributions in complete cancellation or redemption of all of the stock of a corporation, is not essentially equivalent to the distribution of a taxable dividend. If a distribution is made pursuant to a corporate resolution reciting that the distribution is made in liquidation of the corporation, and the corporation is completely liquidated and dissolved within one year after the distribution, the distribution will not be considered essentially equivalent to the distribution of a taxable dividend; in all other cases the facts and circumstances should be reported to the Commissioner for his determination whether the distribution, or any part thereof, is essentially equivalent to the distribution of a taxable dividend."

2. H.Rep.No.179, 68th Cong., 1st sess., pp. 11-12; S.Rep.No.52, 69th Cong., 1st sess., p. 15; S.Rep.No.558, 73d Cong., 2d sess., p. 37; S.Rep.No.1631, 77th Cong., 2d sess., p. 116; S.Rep.No.2375, 81st Cong., 2d sess., pp. 42-43; S.Rep.No. 1622, 83d Cong., 2d sess., pp. 233-237.

The question then is whether the transaction has in substance the same characteristics, attributes, and effect as a dividend distribution.

As provided in the applicable regulation, and as the many courts that have considered this problem have held, each case turns on its own peculiar facts and surrounding circumstances, guided by the terms of the statute and the general principles which have been established through the years by the courts in construing this section.

We agree with the plaintiff's contention that the facts in this case clearly show that the company purchased the shares and held them throughout 1944 for the purpose of resale to Keegan and the other stockholders in order to satisfy Keegan's demands. The plaintiff points out that the purpose of the transaction was not to distribute the earnings and profits of the company but rather to acquire the stock which the company could use in meeting the demands of Keegan for a one-third stock interest in the company. The distribution of an ordinary dividend would not have accomplished the purpose of acquiring stock which could be optioned and resold to Keegan who was a key, and, from a business standpoint, a necessary employee. It has been recognized by the courts that a legitimate business purpose, separate from tax savings, is an important although not conclusive factor to consider in determining the applicability of section 115(g). Keefe v. Cote, 5 Cir., 213 F.2d 651; Commissioner of Internal Revenue v. Sullivan, supra; Commissioner of Internal Revenue v. Snite, 7 Cir., 177 F.2d 819; Smith v. United States, 3 Cir., 121 F.2d 692, and the cases there cited.

The company was not in a particularly good financial condition to warrant the payment of a $59,254 dividend because of the need of funds in the near future for the replacement of its worn equipment and machinery. The company had a definite plan by which it was to recover the $59,254 that it paid for the stock by reselling 1,200 shares to Keegan pursuant to his option and the other 950 shares to the stockholders when the company replaced its worn machinery and equipment. The recovery of the distribution by the corporation is not a characteristic, attribute or effect of a taxable dividend. The Tax Court in Snite v. Commissioner, 10 T.C. 523, and the Seventh Circuit Court in affirming that decision held that where the taxpayer transferred part of his stock in a close corporation to the corporation to be held temporarily as treasury stock and be optioned to certain key employees when the restrictions of the Stablization Act of 1942, 50 U.S.C.A.Appendix, § 961 et seq., were removed, the distribution was not essentially equivalent to a taxable dividend.

The other significant factor that persuades us that this transaction was not a distribution essentially equivalent to a taxable dividend is that the proportionate interest of the stockholders was substantially altered by the transaction. The genesis and purpose of the transaction was to change the proportionate interest of the stockholders in the company. The commissioner of this court has very ably and properly found all of the relevant facts relating to this transaction, including its purpose, intent and effect. The defendant does not object to his findings but argues that the fact that the plaintiff and his associates borrowed money from the company to purchase part of the stock of the company and "redeemed" the stock pro rata is sufficient to make section 115(g) applicable.

The Tax Court held in Sullivan v. Commissioner, 17 T.C. 1420, and the Fifth Circuit Court affirmed that decision, with one judge dissenting, where the stock in a close corporation was redeemed pro rata in exchange for oil leases, equipment and cash, that section 115(g) was inapplicable because the distribution was dictated by the reasonable needs of the corporate business and not for tax avoidance. In the instant case, although the "redemption" was pro rata, the transaction as a whole was designed to effect a change in the proportionate interest of the stockholders in the corpo-

ration. After the transfer of the stock to the corporation the plaintiff owned a two-sevenths rather than three-sevenths stock interest, and more important Keegan owned not just his previous one-seventh but also an option to purchase up to a one-third stock interest in the company. In 1944, Keegan fully intended to exercise this option. The plaintiff parted with his title to the shares and a majority of them were immediately optioned to another stockholder whose interests may well have been adverse to those of the plaintiff as a stockholder. Snite v. Commissioner, supra. The stockholders' relationship with the company had been substantially changed by the transaction.

The defendant's argument based on the fact that the plaintiff borrowed money from the company to purchase part of his stock is not deemed too significant under the facts of this case. It was just a prudent and convenient business arrangement and the funds were repaid or credited with interest. The cases cited by the defendant on this point, Wall v. United States, 4 Cir., 164 F.2d 462; Lowenthal v. Commissioner of Internal Revenue, 7 Cir., 169 F.2d 694; Woodworth v. Commissioner, 6 Cir., 218 F.2d 719, involve factual situations distinguishable from the instant case. A sufficient distinction is that in all three of these cases the stock in close corporations was redeemed pro rata in satisfaction of personal notes held by the corporation and the stockholders' proportionate interest remained the same before and after the transactions, and there was no intention on the part of the corporation to recover the distributions.

It is not necessary to answer the plaintiff's first contention that there was no redemption of the stock here in question since it was held as treasury stock for the purpose of resale, because of the view we take on the primary question of equivalence. It may be noted however, that if all of the other essentials of this section were met, the mere fact that the corporation carried the stock as treasury stock would not in and of itself prevent the application of section 115(g). If the mere carrying of the stock as treasury stock would preclude the application of section 115(g), the section could easily be circumvented and the intent of Congress completely frustrated by a close corporation through the simple expedient of distributing earnings for stock and indefinitely carrying the stock on the corporation's books as treasury stock. See Keefe v. Cote, supra; Boyle v. Commissioner, 3 Cir., 187 F.2d 557, certiorari denied, 342 U.S. 817, 72 S.Ct. 31, 96 L.Ed. 618; Wall v. United States, supra; and cf. Commissioner v. Snite, supra; Kirschenbaum v. Commissioner, 2 Cir., 155 F.2d 23; Alpers v. Commissioner, 2 Cir., 126 F.2d 58. Also we do not consider treasury stock to be an asset of the corporation unless the corporation deals in its own shares as it might in the shares of another corporation. Anderson, Clayton & Co. v. United States, 122 F.Supp. 837, 129 Ct.Cl. 295, certiorari granted, 348 U.S. 936, 75 S.Ct. 356.

After a consideration of the purpose of section 115(g) and the many cases that have been decided under this section, we are of the opinion that the transaction in this case was a sale and not a distribution essentially equivalent to a taxable dividend.

The plaintiff is entitled to recover and judgment will be entered for plaintiff in the sum of $11,070.57, with interest as provided by law.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN, and WHITAKER, Judges, concur.