MaddeN, Judge,
delivered the opinion of the court;
These three cases involve identical questions of fact and law. They are suits for the recovery of income taxes collected from the estates of Bains and Godfrey, and from Barger who died after the payment of the tax, and whose estate is suing for the refund of the tax which he paid. The three taxpayers each owned shares in a corporation which in 1950 redeemed a part of the shares of each of its shareholders, paying the shareholders a fixed price per share. The Government collected the taxes on these payments on the basis that they were fully taxable as dividends. The plaintiffs contend that, because of certain statutory provisions, the payments should have been given capital gains treatment, under which their taxes would have been substantially smaller.
The corporation in question was Bloomsburg Hosiery Mills, Inc., a Pennsylvania corporation. From at least as far back as 1925 the stock of the corporation had been owned, one-half by Edward Bains, one-fourth by J. Lewis Godfrey and one-fourth by John P. Barger. These three men were *601 the officers and directors of the corporation. The corporation had been reasonably successful, had paid cash dividends quite regularly, and issued stock dividends on at least two occasions.
In September 1947 Mr. Godfrey died and his stock passed to a trust which had been created by his will. In February 1949, by a proportionate redemption of 100 shares of stock, which transaction is not in question here, the total number of shares was reduced to 2400, the proportionate ownership remaining as it had been. In July 1949 Edward Bains died, and his 1200 shares passed to a testamentary trust.
After the death of Mr. Bains, various proposals and counter proposals were made and considered by the stockholders. An attempt was made to interest an outsider in purchasing the Bains stock. The potential purchaser wanted to obtain a controlling interest in the corporation and the Godfrey and Barger interests were not agreeable to that. Although the discussions were on an amicable basis, the legal adviser of the Bains trust was prepared to recommend that the trust invoke the Pennsylvania Deadlock Statute and compel an involuntary dissolution of the corporation, if a plan for getting the Bains trust investment out of the corporation could not be agreed upon. This adviser was of the view that a trust which was to provide an income for Mr. Bains’ widow should not have its funds tied up in a small corporation which would have new and untested management. Further, the Bains estate needed money to pay administration costs and estate taxes. The trustees of the Bains trust concluded that the trust should get its money out of the corporation.
For several months in late 1949 and early 1950, the Bains trust, two sons of the deceased Godfrey, and Barger, negotiated. The Godfrey and Barger interests were anxious to keep the corporation in business. In February 1950 all interested parties agreed upon a plan which, they thought, would fulfill the objectives of the several interests. The plan involved three steps: (1) The redemption and cancellation of one-third, i.e., 800 shares, of the outstanding stock of the corporation, at par value, i.e., $100 per share, pro rata among the three shareholders; (b) the sale of 400 *602 of the Bains trust’s remaining 800 shares to J ohn E. Godfrey, Jr., Charles S. Godfrey, they being sons of the deceased J ohn L. Godfrey, Mrs. Marian B. Godfrey, who was Mr. Godfrey’s widow, and Harry T. Gunter, each of these four persons to buy 100 shares; (3) the further sale by the Bains trust of its last 400 shares, 100 each to the same four persons as soon as their financial resources would enable them to complete the purchase.
The plan agreed to in February 1950 was carried into effect substantially as agreed to. The corporation’s charter was amended to reduce the amount of its authorized capital stock. The purchase option agreement which had existed between Bains, Godfrey and Barger was cancelled so that the Bains trust could sell its shares to the four new stockholders.
On June 1,1950 step No. (1) was taken. The 800 shares were redeemed, surrendered and cancelled, and the three stockholders were paid $80,000. On June 29, Mrs. Godfrey, the two Godfrey sons, and Gunter each bought 100 shares of stock from the Bains trust. Thus step No. (2) of the February plan was taken practically contemporaneously with step No. (1). In 1952, by which time Mrs. Godfrey and the two sons had been able to reduce their indebtedness sufficiently to borrow the necessary money from the banks, each bought 100 more shares from the Bains trust. The last 100 Bains shares which Gunter was to have bought, were bought by the corporation, Gunter having sold his 100 shares bought on June 29, 1950, and having resigned his office in the corporation.
As we have said, the instant lawsuit is about the tax status of the $80,000 which was paid on June 1,1950, $40,000 to the Bains trust, $20,000 to the Godfrey trust, and $20,000 to Mr. Barger.
The applicable statutory provisions are in section 115 of the Internal Revenue Code of 1939. Subsection (c) says that amounts distributed by a corporation in partial liquidation shall be treated as in part or full payment in exchange for the stock. If not qualified by other statutory provisions, that would mean that a stockholder’s transferring his shares, or some of his shares, to the corporation, for redemption money, would be treated just as if he had sold his shares to *603 an outside person for tire same amount of money. He would have a capital gain, or loss, depending upon how much he had paid for the stock, and how much he received for it.[1]
But subsection (g) of section 115 qualifies what has been said above. It says:
(g) Redemption of Stock. — If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.
This question of “equivalence”[2] has been extensively litigated. The fact that some other court in a situation resembling our instant one in some respects, but differing from it in many other respects, lias found equivalence or the lack of it, is not very helpful. In some of the decisions the courts have written a long or shorter list of the elements which they have regarded as helpful in reaching their conclusions. See, e.g., Earle v. Woodlaw, 245 F. 2d 119, 126 (C.A. 9); United States v. Fewell, 255 F. 2d 496, 500 (C.A. 5). However, as the courts have frequently said, the answer in each case must be arrived at on the basis of the particular facts of the transaction in question. McGuire v. Commissioner, 84 F. 2d 431, 432-433, (C.A. 7); Woodworth v. Commissioner, 218 F. 2d 719, 723 (C.A. 6); Smith v. United States, 131 Ct. Cl. 748, 756.
In considering the particular facts of the instant case, the important question is whether all of the facts flowing from the February 1950 agreement are relevant, or whether the June 1, 1950 redemption and payment is the only relevant fact. If the June 1 transaction alone is regarded, equivalence is obvious. The corporation has distributed $80,000 of accumulated earnings to its shareholders, pro rata. *604 It has reduced the number of its shares from 2,400 to 1,600, but the Bains trust still owns one-half of the shares, the Godfrey trust one-fourth, and Barger one-fourth. The resemblance to the distribution of a dividend is quite perfect.
If, however, we look at the three steps which were agreed to in February 1950, of which the June 1 redemption was step No. (1), which step, we may assume, would not have been permitted by the Godfrey and Barger interests except for the Bains agreement to the other two steps, the resemblance to the distribution of a dividend disappears.
When the June 1 redemption occurred, it was certain, according to the agreement of the parties, that the Bains trust, instead of retaining one-half the stock and a negative controlling interest in the corporation, would shortly own one-fourth of the stock and be a minority stockholder. And it was equally agreed that, in due course, the Bains trust would have no interest whatever in the corporation; would be as completely eliminated as if it had sold its stock to an outsider. The controlling interest would be in the Godfrey trust and the Godfrey individuals; the Godfrey sons would have the management of the corporation.
If then, we look at the June 1 redemption as a part of an agreed series of steps, which steps were carried through as planned, with one minor variance, the redemption no longer looks like a peaceful process of getting accumulated earnings into the hands of the stockholders on a pro rata basis. It looks, rather, like the beginning of a revolution in the affairs and status of the corporation, which when the revolution is complete, will mean that the corporation has largely new owners and entirely new management.
In the case of Smith v. United States, 131 Ct. Cl. 148, this court held, in a case somewhat comparable to the instant one, that the distribution there in question was not equivalent to a taxable dividend. In Atlantic City Electric Co. v. United States, 142 Ct. Cl. 519, and Idaho Power Co. v. United States, 142 Ct. Cl. 534, we held, under another statute raising a similar problem, that the distributions there involved were not equivalent to dividends. In the instant case We conclude that, considering the transaction as a whole, there is not the equivalence at which section 115 (g) is di *605 rected. Section 115(c) accords capital gains treatment to amounts distributed in partial liquidation, and section 115 (g) is in the nature of an exception to the generalization. We see no reason why the exception should be given an expansive interpretation, resulting in the finding of equivalence where it is not fairly apparent.
The plaintiffs are entitled to recover, with interest as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Buie 38(c).
It is so ordered.
DuRfee, Judge; Laramore, Judge; Whitaker, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff Ethel F. Bains in case No. 41-58 is a citizen of the United States residing at 1810 Westview Street, Philadelphia, Pa. The plaintiff Girard Trust Corn Exchange Bank in the same case is a corporation organized and existing under the laws of Pennsylvania and engaged in the banking business in Philadelphia. The plaintiff bank is the successor co-trustee (through merger with the National Bank of Ger-mantown and Trust Company of Germantown, Pa.) with Ethel F. Bains of the residuary trust created under the will of Edward Bains, deceased, who died July 10, 1949, leaving a last will and testament naming the National Bank of Ger-mantown and Trust Company and his wife, Ethel F. Bains, as trustees of the residuary trust.
2. The plaintiff Marian B. Godfrey in case No. 42-58 is a citizen of the United States residing at 5450 Wissahickon Avenue, Philadelphia, Pa. The plaintiff Girard Trust Corn Exchange Bank in case No. 42-58 is a corporation organized and existing under the laws of Pennsylvania and engaged in the banking business in Philadelphia, Pa. The plaintiff bank is the successor co-trustee (through merger with the National Bank of Germantown and Trust Company of Ger- *606 mantown, Pa.) with Marian B. Godfrey of the residuary trust created under the will of J. Lewis Godfrey, deceased, who died September 14, 1947, leaving a last will and testament naming the National Bank of Germantown and Trust Company and his wife, Marian B. Godfrey, as trustees of the residuary trust.
3. The plaintiff Lydia C. Barger in case No. 130-58 is a citizen of the United States residing at 140 W. 3d Street, Bloomsburg, Pa. John P. Barger, who was the husband of Lydia C. Barger and one of the original plaintiffs in case No. 130-58, died on February 15, 1960, after the joint trial was held in these cases. The Bloomsburg Bank-Columbia Trust Company, a Pennsylvania corporation, was thereafter appointed to serve as executor of the estate of John P. Bar-ger; and, on motion duly allowed by the court, the Blooms-burg Bank-Columbia Trust Company, executor of the estate of John P. Barger, was substituted for John P. Barger, deceased, as a party plaintiff in case No. 130-58.
4. Bloomsburg Hosiery Mills, Inc., of Bloomsburg, Pa., is a corporation that was organized under the laws of Pennsylvania in 1912 with authorized capital common stock of 1,200 shares, each share having a par value of $100. (This company will usually be referred to hereafter in the findings as “the Bloomsburg corporation.”) At all times material to the present litigation, the Bloomsburg corporation was engaged in the business of manufacturing and selling hosiery. Until May of 1919, all of the authorized stock was owned by Edward Bains, but at that time Mr. Bains sold portions of the stock to J. Lewis Godfrey and John P. Barger, who were employees of the corporation, at the price of $127.50 per share. The Bloomsburg corporation made pro rata purchases of stock, totaling 500 shares, from the three stockholders during the years 1920 and 1921, after which there were 700 shares outstanding in the hands of the three stockholders. By a charter amendment effective in April 1922, the authorized capital was increased from 1,200 shares to 2,500 shares of common stock. The additional 1,300 shares were distributed on April 21, 1922, to the three stockholders as nontaxable stock dividends at the ratio of 13 shares for each 7 held. These 1,300 shares thus issued as stock dividends *607 represented a transfer of earnings and profits out of surplus to the capital stock account on the books of the Bloomsburg corporation. After April 21, 1922, there were 2,000 shares of stock outstanding in the hands of the three stockholders.
5. For many years, the three stockholders, Edward Bains, J. Lewis Godfrey, and John P. Barger, were the officers and directors of the Bloomsburg corporation.
6. Under the date of November 16, 1925, the three stockholders entered into an agreement which provided that in consideration of the sale by Edward Bains of additional portions of his stockholdings in the Bloomsburg corporation to J. Lewis Godfrey and John P. Barger, none of the three stockholders would dispose of any stock in the corporation without first offering it to the other two stockholders, in proportion to the total amount of stock which they then held, with a 30-day option to purchase the stock at the book value, as determined by the last annual balance sheet. Pursuant to this agreement, Mr. Bains sold additional portions of Iris stockholdings to the other two stockholders, so that the ownership of the outstanding stock was established as follows: 1,000 shares (or 50 percent) by Edward Bains, 500 shares (or 25 percent) by J. Lewis Godfrey, and 500 shares (or 25 percent) by John P. Barger. This ratio of stock ownership was maintained in the subsequent years, until June 1950.
7. At one time, the Bloomsburg corporation owned and operated three hosiery plants, located at Bloomsburg, Pa., Catawissa, Pa., and Nescopeck, Pa. The Catawissa plant-had a total area of about 4,000 square feet; the Nescopeck plant had an area of about 5,000 square feet; and the Blooms-burg plant had an area of about 26,000 square feet. The plants at Catawissa and Nescopeck generally manufactured a cheaper line of hosiery than the plant at Bloomsburg. Goods made at the Catawissa and Nescopeck plants were delivered to the Bloomsburg plant, where they were dyed, finished, and shipped. The mill at Bloomsburg, which produced a better grade of hose than that produced at Catawissa ■ or Nescopeck, was a completely integrated plant. It contained all the necessary facilities, including those for knitting, finishing, dyeing, packaging, etc.
*608 8. The Catawissa plant was sold by tbe Bloomsburg corporation in November 1937.
9. At the time of World War II, the mill owned by the Bloomsburg corporation at Bloomsburg was in reasonably good condition, so far as its buildings were concerned, but the management believed that the machinery and equipment were becoming obsolete and that an extensive program for the replacement and modernization of machinery and equipment and for the expansion of the plant’s productive capacity would be necessary after the war to meet the postwar competitive conditions. New machinery and equipment could not be obtained during World War II because of wartime scarcities and priorities. The management of the Bloomsburg corporation therefore embarked on a policy of accumulating funds in the form of United States War Bonds during the war to finance the postwar rehabilitation and improvement program. The investment in war bonds during the years 1942-1945 totaled $83,000. The projected program included the replacement of many of the machines at the mill and an expansion of productive capacity through the acquisition of additional machinery. It was also contemplated that a new boiler house would be built and that modern steam-plant equipment would be installed.
10. The Nescopeck plant was sold by the Bloomsburg corporation in November 1945 for $10,000 to the Fine Craft Hosiery Mills, Inc. (which was unrelated to the Bloomsburg corporation). At that time, the remaining unamortized cost of the Nescopeck plant and equipment was $3,737.59. As part of the sales agreement, the Bloomsburg corporation undertook to sell to Fine Craft Hosiery Mills, Inc., all the materials which Fine Craft would need for the production of hosiery, and to buy Fine Craft’s entire output of hosiery. This arrangement for the future operation of the Nescopeck plant was subsequently put into effect. As between the Bloomsburg corporation and Fine Craft, it was largely a bookkeeping arrangement, except that the Bloomsburg corporation paid to Fine Craft from time to time the accumulated difference between the price of the materials furnished to Fine Craft and the price of the hosiery obtained from Fine Craft. These payments by the Bloomsburg corpora *609 tion, in effect, covered Fine Craft’s labor and overlread. The financing of the arrangement with Fine Craft required the use of the Bloomsburg corporation’s working capital to the extent of approximately $35,000 or $40,000.
11. The plant of the Bloomsburg corporation at Blooms-burg consisted of two departments. One department, which employed men, was operated on a 3-shift basis around the clock (with the exception of Saturday afternoons and Sundays) from 1920 until late in 1929, sometimes on a 2-shift basis and at other times on a 3-shift basis in the 1930’s, on a 1- or a 2- or a 3-shift basis at various times during the war period of the 1940’s, and on a 2-shift basis after World War II. The other department, which employed women, was operated on a 1-shift basis at all times pertinent to this litigation.
12. In the years 1946 and 1947, the Bloomsburg corporation distributed nontaxable stock dividends as follows:
Shares issued
Totals Kecipient
April 1946 May 1947
100 150 250 Edward Bains_
50 75 125 John P. Barker_
50 75 125 J. Lewis Godfrey..
200 300 500
These stock dividends, which increased the outstanding stock to 2,500 shares, represented a transfer of earnings and profits out of surplus to the capital stock account on the books of the corporation.
13.In accordance with the postwar program mentioned in finding 9, the Bloomsburg corporation expended $1,570 in 1946, $41,739 in 1947, and $18,966 in 1948 for new machinery and equipment. (These sums did not include additional amounts spent by the corporation for the transportation and installation of the new machinery and equipment.) The new machinery and equipment included 15 fully-automatic Komet knitting machines (purchased from the Bentley Engineering Company of Great Britain), 5 Southern Textile looping machines, a Smith drum, a Fletcher extractor, a Stokes and Smith wrapper, complete with automatic gluer *610 and conveyor belt, and a new printing press in the finishing department for printing waybills. They were purchased to replace items that were getting old and to expand the productive capacity of the Bloomsburg plant.
14. The Bloomsburg corporation’s investment in United States War Bonds (see finding 9) was reduced to $58,000 by the end of 1947 due to sales of such bonds during that year. No further sales of such bonds were made in 1948.
15. While the postwar program for the modernization of the Bloomsburg plant and the expansion of its productive capacity was being carried out, J. Lewis Godfrey died on September 14, 1947. Under Mr. Godfrey’s will, his stock in the Bloomsburg corporation passed to a testamentary trust, of which his widow, Mrs. Marian B. Godfrey, was co-trustee and income beneficiary for her life, with the God-freys’ two sons, John L., Jr., and Charles S., as the remain-dermen of the trust corpus after the death of Mrs. Godfrey. The National Bank of Germantown and Trust Company (which later merged with the Girard Trust Com Exchange Bank) was the other trustee. The trustees were empowered to pay to Mrs. Godfrey as much of the corpus or principal of the residuary or trust estate as might be necessary, in the judgment of the corporate trustee, for the needs of Mrs. Godfrey or any of her children by reason of sickness, accident, economic reverses, or any other special emergency.
16. The arrangement between the Bloomsburg corporation and Fine Craft Hosiery Mills, Inc., mentioned in finding 10, whereby the Bloomsburg corporation furnished raw materials to Fine Craft and purchased Fine Craft’s output of hosiery, was terminated in November 1948.
17. The Bloomsburg corporation’s plans for the modernization of the plant at Bloomsburg and the expansion of its productive capacity were never fully carried out. For example, it was planned eventually to buy five more Komet knitting machines (in addition to those mentioned in finding 13) but they were never purchased. Also, nothing was done to replace the boiler or modernize the boiler house. The reasons for the failure to carry out the projected program of modernization and expansion are indicated in subsequent findings.
*611 18. (a) As indicated in finding 15, J. Lewis Godfrey died in September 1947. At about the same time, Edward Bains fell into poor health, and thereafter Mr. Bains was no longer active in the business of the Bloomsburg corporation. He consulted with Mr. Barger occasionally, but never recovered his health to the point where he could return to his office. In the year 1949, Walter Biddle Saul, attorney at law from Philadelphia, was elected to the board of directors of the Blooms-burg corporation. He was a personal friend of Edward Bains, and was nominated by Mr. Bains to take his place on the board because Mr. Bains was too ill to attend meetings of the board. Mr. Bains died on July 10, 1949. After Mr. Bains’ death, two of the three former officers and directors of the Bloomsburg corporation were gone, and Mr. Barger was the only experienced senior executive left. Mr. Barger felt unequal to the task of carrying alone the full responsibility for the corporation’s affairs on the expanded scale which had been projected for the postwar period. He, too, was becoming older, and he looked forward to retirement. Under the circumstances, it was considered advisable to cut back the ambitious program which had been undertaken for postwar plant improvement and expansion (see findings 9 and 13), to operate on a more modest scale than had been contemplated, and, in the meantime, to bring in and train new management, in the hope that after a few years of experience the new management could carry on the affairs of the corporation.
(b) The subject of new management for the Bloomsburg corporation had been broached by Mr. Barger to Mr. Bains prior to the latter’s death. It had been agreed then that John L. Godfrey, Jr., and Charles S. Godfrey, sons of the late J. Lewis Godfrey, and one Harry T. Gunter would be brought in and given training to take over the top executive positions in the corporation. As of that time, Harry T. Gunter had been employed by the Bloomsburg corporation for 5 or 6 years, and John L. Godfrey, Jr., had worked for the corporation from 1939 to 1941 and also since his return in 1946 from wartime service with the Armed Forces. Charles S. Godfrey had not worked for the Bloomsburg corporation theretofore. Messrs. Bains and Barger agreed in principle *612 that stock of the Bloomsburg corporation should be made available to the younger men mentioned above as an incentive to them to make their careers with the corporation, but Mr. Bains was not willing for a time to give up any stock in a way that would reduce his 50 percent interest in the corporation. Prior to his death in 1949, however, Mr. Bains finally agreed to make 50 shares of his stock available to the younger men. The Godfrey estate agreed to part with 25 shares and Mr. Barger also agreed to give up 25 shares.
19. (a) In accordance with the agreement mentioned in finding 18(b), the Bloomsburg corporation on February 22, 1949, redeemed pro rata from the three stockholders (Messrs. Bains and Barger and the Godfrey trust) 100 shares of the corporation’s stock at a price of $110 per share. These 100 shares were not canceled but were held as treasury stock. This redemption left 2,400 shares of stock outstanding in the same proportionate ownership as had previously existed.
(b) The 100 shares of stock referred to in paragraph (a) of this finding were earmarked primarily for purchase by Harry T. Gunter. However, Mr. Gunter never purchased this block of stock.
20. Under Edward Bains’ will, his stock in the Blooms-burg corporation passed to a testamentary trust for the benefit of his wife, Mrs. Ethel F. Bains, for her life, with a general power of appointment in her to appoint the remainder interest. Mrs. Bains and the National Bank of German-town and Trust Company (which later merged with the Girard Trust Corn Exchange Bank) were named as trustees. Under the terms of the will, Mrs. Bains, upon written request, could demand $5,000 per year from the principal of the trust; and any additional amount could be withdrawn from the principal within the discretion of the trustees. The stock of the Bloomsburg corporation owned by Edward Bains formed a substantial part of that trust estate, of which Mrs. Bains was the sole life-income beneficiary.
21. After the death of Edward Bains on July 10, 1949, Walter Biddle Saul, who was also counsel for the Blooms-burg corporation, became attorney for the Bains estate and adviser to the testamentary trust under Mr. Bains’ will.
*613 22. In the fall of 1949, Mr. Saul, as adviser to the Bains trust, became convinced that the trust should dispose of its holdings of stock in the Bloomsburg corporation. He did not believe that a large investment in the stock of a relatively small, closely held manufacturing corporation, with new and untried management, was the type of investment suitable for a testamentary trust which was to provide income to a widow. It was his opinion that the principal of this trust should be more diversified and should be invested in securities which would be safer from business hazards and provide a better income for Mrs. Bains than the stock in the Bloomsburg corporation. In addition, Mr. Saul wanted to raise money for the payment of administration expenses and death taxes. He accordingly advised the trustees of the Bains trust to dispose of the stock of the Bloomsburg corporation in any way possible. The trustees agreed with Mr. Saul’s views.
23. Mr. Saul, on behalf of the Bains trust, then notified the other two stockholders — the Godfrey trust and Mr. Bar-ger — that he was desirous of liquidating as much of the Bains interest in the Bloomsburg corporation as possible. Extensive negotiations thereafter ensued between Messrs. Saul, Barger, John L. Godfrey, Jr., Charles S. Godfrey, and Donald H. Williams, Trust Officer of the bank-trustee of each trust, both by personal meetings and through correspondence. These negotiations lasted from the early fall of 1949 until February 1950. The Godfrey and Barger interests were anxious that the Bloomsburg corporation continue doing business.
24. Various proposals and counter-proposals respecting the future of the Bloomsburg corporation were made among the interested stockholders (Mr. Barger, the Bains trust, and the Godfrey trust) during the fall of 1949. At one time, an attempt was made to interest an outsider in purchasing the Bains interest. This outsider, one Paul Sutro, indicated that he was interested in purchasing the corporation or its stock, but he made it clear that he wanted at least a majority interest, or nothing at all; and since the Barger and Godfrey interests, owning 50 percent of the stock, wanted to continue in business, the negotiations with Mr. Sutro came to nothing. *614 Another proposal was that a substantial portion of the Bains stock be converted into preferred stock, with another substantial portion of the Bains stock being redeemed, leaving the Barger and Godfrey interests with common stock. This plan also was rejected. The negotiations throughout this period were conducted on an amicable basis. However, if some plan satisfactory to the Bains interest could not be worked out, Mr. Saul was prepared to recommend to the Bains trust that it invoke the Pennsylvania Deadlock Statute (Act of May 5, 1933, 15 Purdon’s Pa. Stats., Sec. 2852-1107) and force an involuntary dissolution of the Bloomsburg corporation.
25. As the result of the negotiations mentioned in findings 23 and 24, a plan was finally evolved in February 1950 which was agreeable to all concerned and which they felt met all the desired objectives, in that it would give the Bains trust some needed funds immediately and eventually permit the conversion of the entire Bains interest into cash, it would put stock into the hands of the new management, and it would make possible the continuance of the Bloomsburg corporation in business. The plan involved three steps: (a) the redemption and cancellation of one-third of the outstanding capital stock of the Bloomsburg corporation (or 800 shares) at par value, pro rata among the three existing shareholders; (b) the sale within the near future of 400 shares of the Bloomsburg corporation’s stock by the Bains trust as follows: 100 shares to John L. Godfrey, Jr., 100 shares to Charles S. Godfrey, 100 shares to Mrs. Marian B. Godfrey (widow of the late J. Lewis Godfrey and mother of John L. Godfrey, Jr., and Charles S. Godfrey), and 100 shares to Harry T. Gunter; and (c) the subsequent sale by the Bains trust of 100 shares of stock each to the three Godfreys and Harry T. Gunter as soon as the purchasers’ financial resources would permit.
26. The plan outlined in finding 25 was carried into effect substantially as agreed to in February 1950. On February 27, 1950, the stockholders and directors voted to amend the Bloomsburg corporation’s charter and reduce its authorized *615 capital stock from 2,500 shares to 1,700 shares, of a par value of $100 each. The restrictive stock option agreement of 1925 between Messrs. Bains, Godfrey, and Barger (see finding 6) was canceled on March 7, 1950, by the mutual agreement of Mr. Barger and the representatives of the Bains and Godfrey trusts, so that stock could be made available to the new stockholders by the Bains trust. After the necessary formalities involved in amending the charter of the Bloomsburg corporation had been carried out with the State authorities at Harrisburg, Pa., the actual redemption by the Bloomsburg corporation of the 800 shares at $100 per share, pro rata among the three existing shareholders, took place on June 1,1950. The Bains trust thus had 400 shares redeemed, the Godfrey trust had 200 shares redeemed, and Mr. Barger had 200 shares redeemed. The shares so redeemed were canceled. At the time of the redemption, the book value of the corporation’s stock was higher than its par value. Subsequently, when the purchasers had been able to arrange the necessary financing, Mrs. Marian B. Godfrey, John L. Godfrey, Jr., Charles S. Godfrey, and Harry T. Gunter each bought 100 shares of stock from the Bains trust on June 29,1950.
27. In 1952, when Mrs. Marian B. Godfrey, John L. God-frey, Jr., and Charles S. Godfrey had been able to reduce their indebtedness to the point where they could obtain additional credit from the banks, each of them purchased an additional 100 shares of the Bloomsburg corporation’s stock from the Bains trust. The final 100 shares of stock held by the Bains trust, which were supposed to be bought by Harry T. Gunter, were not purchased by him but were purchased by the Bloomsburg corporation in 1952 and held as treasury stock, since Mr. Gunter had decided that he no longer wished to continue with the corporation and had resigned and disposed of all his stock.
28. The stock ownership of the Bloomsburg corporation, prior to and immediately after the redemption and sales mentioned in findings 26 and 27, was as follows:

*616

29. At the end of 1949, the Bloomsburg corporation’s investment in United States War Bonds (see findings 9 and 14) had been reduced to $53,000 as the result of further bond sales during 1949. The remaining bonds were sold by the corporation on May 10,1950.
30. For the years 1946 through 1950, the Bloomsburg corporation had the following working capital at December 31, being the excess of its current assets over its current liabilities :

Worlcing Tear capital

1946_ $246,069.08
1947_ 247, 055.80
1948_ 242,175. 99
1949_ 227, 262. 66
1950_ 136, 031. 56
31. At the end of the year 1949, the corporation had between $80,000 and $100,000 of working capital in excess of its reasonable needs, considering its scale of operations at the time, the discontinuance of the arrangement with Fine Craft Hosiery Mills, Inc. (see findings 10 and 16), and the abandonment of the program to modernize and expand the productive capacity of the plant at Bloomsburg.
32. For the years 1925 through 1950, inclusive, the Blooms-burg corporation had the following net income (or net loss) after taxes, and paid the following ordinary cash dividends to its shareholders:

*617

33. The net sales, Federal income and excess profits taxes paid, net income after taxes, cash dividends, and stock dividends of the Bloomsburg corporation for the years 1941 to 1950, inclusive, were as follows:

34. At the end of each year during the period 1946-1950, the Bloomsburg corporation’s balance sheet showed the following:

*618

*619 35. On or about January 8, 1951, John P. Barger and Lydia C. Barger filed with the Director of Internal Revenue at Scranton, Pa., a joint Federal income tax return on Form 1040 for the calendar year 1950, showing a tax due of $5,036.48. This amount was paid to the Director by with-holdings on salary, payments of estimated tax, and a final payment of $918.68 on January 16,1951. The sum of $20,000 received in 1950 by Mr. Barger for the redemption of 200 shares of stock in the Bloomsburg corporation was not reported.
36. On or about March 15,1951, the trustees of the Edward Bains trust filed with the Director of Internal Revenue at Philadelphia, Pa., a Federal fiduciary income tax return on Form 1041 for the calendar year 1950. The return showed an income tax due of $110.17, and this amount was paid to the Director on March 15,1951. In the return, a net income to the Bains trust of $11,324.15 was reported, of which $10,-591.02 was distributed to Mrs. Ethel F. Bains. The sum of $40,000 received in 1950 by the Bains trust for the redemption of 400 shares of stock in the Bloomsburg corporation was not reported.
37. On or about March 30, 1951, the plaintiffs Marian B. Godfrey and Girard Trust Corn Exchange Bank, as trustees of the Godfrey trust, filed with the Director of Internal Revenue, Philadelphia, Pa., a Federal fiduciary income tax return on Form 1041 for the calendar year 1950. The return showed no tax due. In the return, a net income to the God-frey trust of $5,777.87 was reported, of which $5,700 was distributed to Mrs. Marian B. Godfrey. The $20,000 that was received in 1950 by the Godfrey trust for the redemption of 200 shares of stock in the Bloomsburg corporation was not reported.
38. Upon audit of the income tax returns mentioned in findings 35, 36, and 37, the Commissioner of Internal Revenue determined that the proceeds from the redemption of the 800 shares of the Bloomsburg corporation’s stock on June 1, 1950, should be treated as distributions of earnings and profits, essentially equivalent for tax purposes to the receipt of ordinary taxable dividends by the shareholders. The Commissioner accordingly assessed deficiencies of income tax *620 and interest against the respective taxpayers, as indicated in findings 39,40, and 41.
39. The Commissioner of Internal Bevenue assessed a deficiency of income tax in the amount of $17,146.54, and interest in the amount of $3,051.38, against the Bains trust for the year 1950, based upon the addition to ordinary income of the $40,000 that was distributed by the Bloomsburg corporation to the trust in redemption of 400 shares of stock in the corporation. The deficiency and interest, totaling $20,197.92, were paid by the trustees on or about March 15,1954.
40. The Commissioner of Internal Bevenue assessed a deficiency of income tax in the amount of $6,579.93, and interest in the amount of $1,170.95, against the Godfrey trust for the year 1950, based upon the addition to ordinary income of the $20,000 that was distributed by the Bloomsburg corporation to the trust in redemption of 200 shares of the corporation’s stock. The deficiency and interest, totaling $7,750.88, were paid by the trustees on or about March 15,1954.
41. The Commissioner of Internal Bevenue assessed a deficiency of income tax in the amount of $8,531.92, and interest in the amount of $1,452.86, against John P. Barger and Lydia C. Barger for the year 1950, based upon the addition to ordinary income of the $20,000 that was distributed by the Bloomsburg corporation to John P. Barger in redemption of 200 shares of the corporation’s stock. Mr. and Mrs. Barger paid the deficiency of $8,531.92 on or about March 5, 1954, and paid the interest of $1,452.86 on or about April 8, 1954.
42. On December 8, 1954, Marian B. Godfrey and Girard Trust Corn Exchange Bank, as trustees of the J. Lewis God-frey trust, filed with the Director of Internal Bevenue at Philadelphia, Pa., a timely claim for refund of the tax and interest for the year 1950 mentioned in finding 40. By a registered letter dated February 1, 1956, the trustees were advised of the rejection of the refund claim.
43. On December 9,1954, Ethel F. Bains and Girard Trust Corn Exchange Bank, as trustees of the Edward Bains trust, filed with the Director of Internal Bevenue in Philadelphia, Pa., a timely claim for refund of the additional income tax and interest for the year 1950 mentioned in finding 39. By *621 a letter dated February 1, 1956, the trustees were advised by registered mail of the rejection of this refund claim.
44. On February 25, 1955, John P. Barger and Lydia C. Barger filed with the Director of Internal Revenue at Scranton, Pa., a timely claim for refund of the tax and interest for the year 1950 mentioned in finding 41. By a registered letter dated April 12, 1956, Mr. and Mrs. Barger were advised of the rejection of their refund claim.
45. (a) In the case of the respective plaintiffs, the ad j usted basis (if applicable) for computing gain or loss upon the exchange or sale of the Bloomsburg corporation’s stock which was redeemed on June 1, 1950, was as follows:
Plaintiffs Ethel E. Bains and Girard Trust $121.00 per share.
Corn Exchange Bank (No. 41-58).
Plaintiffs Marian B. Godfrey and Girard $110.00 per share.
Trust Corn Exchange Bank (No. 42-58).
Plaintiffs Lydia C. Barger and Bloomsburg $80.00 per share.
Bank-Columbia Trust Company (No. 130-58).
(b) On June 1, 1950, John P. Barger had held his shares of stock in the Bloomsburg corporation for longer than 6 months.
46. The plaintiffs are the sole owners of their respective claims and have made no assignment or transfer thereof.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover, with interest, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c).
In accordance with the opinion of the court and on memorandum reports of the commissioner as to the amounts due thereunder, it was ordered on August 14, 1961, that judgments for the plaintiffs be entered as follows:
No. 41-58_$20,197. 92
No. 42-58_ 7,750.88
No. 130-58_ 7,840.34
*622 together with interest as provided, by law. It was further ordered on September 15, 1961, that a supplemental judgment be entered for plaintiffs in No. 130-58 for $1,335.09, together with interest thereon as provided by law with the prior judgment of August 14, 1961, to remain in full force and effect.

 See the quotation, in White v. United States, 305 U.S. 281 at 290, from the reports of the Congressional Committees on section 201 of the Revenue Act of 1924, which contained the provision later embodied in section 115(e), applicable in this case.

 See Stein v. United States, 104 Ct. Cl. 446, 455.