**UNITED STATES of America,**
**Appellant,**
**v.**
**Gerald and Gladys CAREY, Appellees.**
**No. 16672.**

United States Court of Appeals
Eighth Circuit.

May 5, 1961.

David O. Walter, Atty., Dept. of Justice, Washington, D. C., for appellant. Abbott M. Sellers, Acting Asst. Atty. Gen., and Lee A. Jackson and Harry Baum, Attys., Dept. of Justice, Washington, D. C., and also Francis E. Van Alstine, U. S. Atty., Sioux City, Iowa, on the brief.

Marvin A. Miller, Cherokee, Iowa, for appellee.

Before SANBORN, VAN OOSTER-HOUT and MATTHES, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

This is an appeal by the Government from a final judgment awarding taxpayer Carey [1] a recovery of $5,340.70 plus interest for 1954 income taxes alleged to have been wrongfully assessed and collected. Timely claim for refund was filed and rejected, whereupon taxpayer commenced this action. Jurisdiction is established.

This case was consolidated for trial with a similar suit for tax refund filed by Leonard Brown. The cases were tried to the court without a jury. Findings of fact and conclusions of law were filed (not reported) and final judgment was entered for the taxpayer in each case.

The Government filed a timely appeal from the judgment in favor of Carey. No appeal has been taken from the judgment in favor of Brown. [2]

The issue presented by this appeal is whether under the circumstances here presented the distribution of corporate property to the taxpayer and Brown in redemption of stock is taxable as a capital gain, as contended by the taxpayer, or taxable as ordinary income as a distribution essentially equivalent to a dividend, as urged by the Government.

The basic facts are not in dispute. Gerald Carey and Leonard Brown incorporated Carey-Brown Motors, Inc., in 1948. Each contributed $20,000 and each received 200 shares of the 400 shares of stock issued. In 1950 a 50% non-taxable stock dividend was declared and distributed, raising the stock ownership of Brown and Carey to 300 shares each. The business of the corporation was the operation of a Buick sales and service agency at Cherokee, Iowa.

Brown was, at all times material, engaged in the oil business. Initially he devoted about half of his time to the corporation's business, but as his oil business expanded he had less time for the automobile business. Carey devoted full time to the automobile business. Appropriate salary adjustments were made to reflect the difference in time devoted by Carey and Brown to the corporation's business.

In 1953 automobiles became more plentiful and the automobile business became more competitive. More manpower was needed to perform the sales effort required to move automobiles. Louis Larson, a salesman employed by the corporation who had been quite successful, was considering leaving the company for other employment. Brown was unable to devote adequate time to the automobile business. After a full discussion of the corporate situation, Brown and Carey decided in 1954 that Brown would sell his stock interest, worth about $50,000, to a purchaser who could devote his time to the automobile business and that Brown would completely retire from the business.

Additional pertinent facts as found by the trial court, which are substantially undisputed, are:

"They soon discovered, however, that an interested buyer with $50,000 to invest could not be found; that the original plan for the sale of the Brown interest in the corporation, for that reason, could not be made without a downward change in the capital requirements and that a reduction of the corporation's assets to the extent of approximately $40,000, would have to be made in order for Brown to sell as originally planned. One Louis Larson—an em-

---

1. Gladys Carey, wife of taxpayer Gerald Carey, is a party to this suit because a joint return was filed. Like the parties in their briefs, we will refer to the appellees as taxpayer or Carey.

2. The Government in its brief states, "The Government does not appeal from the judgment in favor of the Browns, since their interest in the corporation was terminated as a result of the transaction in question."

ployee of the corporation—willing to buy the Brown interest in the corporation providing it could be done for $22,000, or thereabouts, was the only offer Brown had, when in early September, 1954, he and Carey decided on the reduction expedient as a means for consummating of the original sale plan.

"The court further finds that dissolution of the corporation was a part of said original plan for Brown to sell. Such a dissolution was abandoned, however, when their counsel suggested, that the original plan could be worked out by the corporation transferring and conveying to Carey and Brown its building and book accounts valued at $39,453.20, in consideration for a redemption by the corporation of 145 shares of its stock owned by Carey and a like number by Brown, a subsequent transfer and sale to Larson and Carey, by Brown of his remaining 155 shares for a total consideration of $22,239.78, and by amendment of the Articles, a change in the name of the corporation to Carey-Larson Motors, Inc.

"That arrangement was thereafter, during a period commencing September 28, 1954, and ending about a week later, fully carried out and completed by and through a series of steps resulting in: (1) Pro-rata redemption by the corporation from its two stockholders, Carey and Brown, of 290 shares of its capital stock and as consideration therefor sale and transfer to them of the corporation's building and its book accounts, valued at $39,453.20; (2) a leasing of that building to the corporation for three years; (3) a sale by Brown of 2 shares of his corporation's stock to Carey and his remaining 153 to Larson for a total of $22,239.78; (4) a change in the corporation name to Carey-Larson Motors, Inc.; (5) election of Larson as its secretary, and (6) a complete severance of Brown's

interest in the corporation project, said redemption, transfer of said property and sale of Brown's remaining shares of stock to Larson for all practical purposes being concurrent acts, they having been carried out during the period September 28 through October 1, and with (4), (5) and (6) completed October 7, 1954."

The court also made the following finding:

"That the transaction when finally completed aside from the change as to membership of the corporation's Board of Directors and Officers, caused contraction of its business operations in that it compelled business being done on a more limited capital basis."

The Government controverts the finding that a contraction in business occurred.

The corporate net income from the years 1948 to 1953 was as follows:

| 1948 | $15,632.90 |
|---|---|
| 1949 | 18,095.93 |
| 1950 | 17,038.65 |
| 1951 | 13,568.10 |
| 1952 (Loss) | (1,611.31) |
| 1953 | 682.25 |

The corporate surplus earnings as of December 31, 1953, were $47,633, and on September 28, 1954, were $45,436.

There is no evidence in the record as to the corporation's financial progress subsequent to September, 1954. No claim of tax avoidance motive is made. The record strongly supports the conclusion that the purpose of the series of related transactions was to effect a transfer of the stock ownership of the corporation.

The court's judgment was based upon its conclusions of law reading as follows:

"That the said pro rata redemption by Carey-Brown Motors, Inc., of 290 shares of its capital stock, used as a capital structure reduction expedient to meet the unexpect-

ed sales exigencies Carey and Brown encountered as they sought to complete the plan referred to in the Findings herein, coupled with Brown's concurrent actual sale of all of his stock and interest in the corporation, constituted a redemption not essentially equivalent to a dividend under Section 302(b) (1) of the Internal Revenue Code of 1954 [26 U.S.C.A. § 302(b) (1)], therefore, under Section 302(a) of that Code to be treated as a distribution in full payment for the stock redeemed from Brown and taxed at capital gains rates.

"That said redemption since it also resulted in a contracting of the corporation's activity because of the reduced capital, since it was part of a plan and thereunder completed within the time limits prescribed by Section 346(a) (2) [26 U.S.C.A. § 346(a) (2)], constituted a distribution to be treated as a partial liquidation of the corporation under Section 346(a) (2), under Section 331(a) (2) [26 U.S.C.A. § 331(a) (2)] thereof as being in full payment and the stock redeemed from Carey and therefore, also, taxable at capital gains rates."

Unless the Government has demonstrated that the court committed error in determining that the redemption of stock was not essentially equivalent to a dividend, the judgment must be affirmed.

The consideration of the statutory background seems to be desirable. Such history is well summarized by Mertens Law of Federal Income Taxation, Vol. 1, § 9.69, pp. 101–103:

"Section 115(c) of the 1939 Code [26 U.S.C.A. § 115(c)] provided (as does Section 331 of the 1954 Code) that amounts distributed in partial liquidation shall be treated as 'in part or full payment in exchange for the stock' and Section 115(i) of the 1939 Code defined those amounts as amounts distributed 'in complete cancellation or redemption' of all or part of the stock. Since under the 1939 Code (since 1942) as under the 1954 Code, amounts received in partial liquidation receive capital gains treatment regardless of the existence of earnings and profits, the literal language of the sections provided an easy method to distribute earnings at a low tax cost through judicious redemptions. The approach taken by the 1939 Code to this problem was the use of a general provision, Section 115(g) (1), which at the enactment of the 1954 Code had for some years read as follows:

" 'If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.'

"There are a great many decisions interpreting this section. While the decisions are, in general, progressively less favorable to the taxpayer, there continued to be two lines of cases holding Section 115(g) inapplicable. The first lines of cases approached the question from the stockholder level and held that if his interest in the corporation was completely terminated (or, in some cases, disproportionately reduced), the distribution would not have the effect of a taxable dividend since one of the elements of such a dividend is the recipient's continued interest in the corporation. The other line of cases approached the question from the corporation level and held that if there was a bona fide contraction in the corporation's business the corporation could distribute in liquidation (even pro rata to

its stockholders) the assets no longer needed as a result of that contraction. Since the stockholders no longer retained a continuing interest in the *same* business but rather in a materially reduced one, once again an important element of an ordinary dividend was missing.

"The 1954 Code attempts to separate those two approaches in the statute itself. * * * "

The Senate Finance Committee Report on the Internal Revenue Code of 1954 to the 83rd Congress, 3 U.S.Cong. & Adms.News (1954) 4672, 4680, states:

"Your committee, as did the House bill, separates into their significant elements the kind of transactions now incoherently aggregated in the definition of a partial liquidation. Those distributions which may have capital-gain characteristics because they are not made pro rata among the various shareholders would be subjected, at the shareholder level, to the separate tests described in part I of this subchapter. On the other hand, those distributions characterized by what happens solely at the corporate level by reason of the assets distributed would be included as within the concept of a partial liquidation."

Section 302, Internal Revenue Code of 1954,[3] which relates to the treatment of stock redemption at the shareholder level, provides:

"§ 302. Distributions in redemption of stock.

"(a) General rule.—If a corporation redeems its stock * * *, and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

"(b) Redemptions treated as exchanges.—

"(1) Redemptions not equivalent to dividends.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend."

Paragraphs (2), (3) and (4) of Subsection (b) provide for certain specific situations that warrant capital gain treatment for stock redemptions. It is obvious that none of such paragraphs applies to the facts in this case and no one so contends.

Paragraph (5) of Subsection (b) specifically provides:

"In determining whether a redemption meets the requirements of paragraph (1), the fact that such redemption fails to meet the requirements of paragraph (2), (3), or (4) shall not be taken into account. * * * "

Thus, under § 302, if the stock redemption is not essentially equivalent to a dividend, capital gain treatment is authorized. However, since it is undisputed that accumulated profits exceeded the amount paid out in stock redemption, if the transaction is substantially equivalent to a dividend, the amount distributed would be taxable as ordinary income. See § 301, 26 U.S.C.A. § 301.

Section 331(a) (2), relating to treatment of partial liquidation at the corporation level, provides:

"§ 331. Gain or loss to shareholders in corporate liquidations.

"(a) General rule.—

* * * * * *

"(2) Partial liquidations.—Amounts distributed in partial liquidation of a corporation (as defined in section 346) shall be treated as in part or full payment in exchange for the stock."

Section 346(a), defining the partial liquidation so far as here material, provides:

"§ 346. Partial liquidation defined.

"(a) In general.—For purposes of this subchapter, a distribution

3. Code references in this opinion are to the Internal Revenue Code of 1954 unless otherwise indicated.

shall be treated as in partial liquidation of a corporation if—

\* \* \* \* \* \*

"(2) the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year, including (but not limited to) a distribution which meets the requirements of subsection (b)."

Subsection 346(b) sets out a specific type of distribution involving the termination of a business activity conducted for five years which will constitute a liquidation not equivalent to a dividend. Taxpayer does not claim that he meets the conditions of subsection (b).

The Government's contention is that under Section 346(a) (2), contraction of the corporate business is an essential prerequisite to treatment of the liquidation distribution as a return of capital. Such prerequisite, if it exists, applies only to liquidations viewed in the corporation level under Section 346(a) and not to redemptions under Section 302.

It is noted § 346(a) (2) uses the words "including (but not limited to) a distribution which meets the requirements of subsection (b)." From this it is clear that Congress intended to provide for capital gain treatment for some transactions not meeting the tests prescribed by subsection (b). There is no specific language in § 346(a) (2) with regard to contraction nor is any statutory definition of the term provided.

The Government places considerable reliance on the Senate Finance Committee Report, supra. Such report is lengthy, somewhat ambiguous and inconclusive in light of the plain language used in the statute. The report as a whole indicates an intention to retain the essentially equivalent to dividend test.

The problem of statutory construction presented by this appeal has been described as "nightmarish". United States v. Fewell, 5 Cir., 255 F.2d 496, 499.

The Tax Court in Thomas G. Lewis v. Commissioner, 35 T.C. No. 11, commenting on changes made in the 1954 Code resulting in §§ 301 and 302, states: "The general statutory framework, with many confusing cross references, makes the study and application of these provisions a most exasperating task."

We agree that it is very difficult to ascertain from the provisions of the 1954 Code the precise object which Congress was seeking to accomplish by the changes that it made in existing law.

We believe that the first conclusion of the trial court holding that the redemption of the stock under § 302(b) (1) was not essentially equivalent to a dividend has legal and factual support to entitle taxpayer to an affirmance. Thus, we deem it unnecessary to determine the troublesome and doubtful question of what constitutes a contraction of business under § 346, and the additional question of whether the court was justified in determining in its second conclusion that the transaction resulted in a contraction of the corporate business such as to warrant the application of § 346(a) (2).

As we heretofore pointed out, § 115 of the Internal Revenue Code of 1939 did not provide for the separate viewing of stock redemptions and partial liquidations for their effect upon the shareholder and the corporation but provided for an overall appraisal of the question of dividend equivalence.

No cases have been cited or found dealing directly with the interpretation to be given the "essentially equivalent to a dividend" test appearing in §§ 302(b) (1) and 346(a) (2). It clearly appears from the Senate Report, supra, that Congress at the time it enacted the Internal Revenue Code of 1954 was familiar with the interpretation given the dividend-equivalent language by the courts, and it appears from the legislative history as a whole that Congress had no intention to change the meaning of "essentially equivalent to dividend" as interpreted by the courts in cases arising under the

1939 Code, in a situation such as here presented, where the facts do not fall within any of the specific new provisions contained in §§ 302(b) or 346. The statutes themselves and the Senate Finance Committee Report appear to indicate a Congressional intention to retain the flexible equivalent to dividend test developed by the cases in determining the treatment to be given stock redemptions and partial liquidation under §§ 302 and 346. The Senate Finance Committee in its report on § 302 states, in part:

"Section 302 corresponds in function to section 302 of the House bill and relates to section 115(c), (g), and (i) of the 1939 Code. * * * Unlike the House bill, however, section 302 does not provide specific statutory guides governing the tax consequences of every stock redemption. In lieu of the approach in the House bill, your committee intends to revert in part to existing law by making the determination of whether a redemption is taxable as a sale at capital gains rates or as a dividend at ordinary income rates dependent, except where it is specifically provided otherwise, upon a factual inquiry."

The question of whether a distribution in redemption of stock is essentially equivalent to a dividend has been frequently considered in cases arising under the 1939 Code as one of fact dependent upon the circumstances of each case. Heman v. Commissioner, 8 Cir., 283 F.2d 227, 231; Earle v. Woodlaw, 9 Cir., 245 F.2d 119, 122; Ferro v. Commissioner, 3 Cir., 242 F.2d 838, 841; Vesper Co. v. Commissioner, 8 Cir., 131 F.2d 200, 203.

█ The ultimate conclusion reached by the trial court on the dividend-equivalent issue can be reversed only if it is without substantial evidentiary support or induced by an erroneous view of the law.

Criteria have been established as guideposts in applying the dividend-equivalency test. In the recent case of Heman v. Commissioner, 32 T.C. 479, affirmed, 8 Cir., 283 F.2d 227, the Tax Court states:

"Whether or not a particular transaction involves the essential equivalent of a taxable dividend is a question of fact. Ferro v. Commissioner, (C.A. 3, 1957) 242 F.2d 838, affirming a Memorandum Opinion of this Court; Regs. 111, sec. 29.115-9. There is no sole decisive test, Flanagan v. Helvering [73 App. D.C. 46] (1940), 116 F.2d 937, affirming a Memorandum Opinion of this Court, but a number of judicial criteria or guideposts have been determinative in placing a transaction within section 115(g).

"Among these criteria are: The presence or absence of a bona fide corporate business purpose; whether the action was initiated by the corporation or by the shareholders; did the corporation adopt any plan or policy of contraction, or did the transaction result in a contraction of the corporation's business; did the corporation continue to operate at a profit; whether the transaction resulted in any substantial change in the proportionate ownership of stock held by the shareholders; what were the amounts, frequency, and significance of dividends paid in the past; was there a sufficient accumulation of earned surplus to cover the distribution, or was it partly from capital. Flanagan v. Helvering, supra; Earle v. Woodlaw. (C. A. 9, 1957) 245 F.2d 119; certiorari denied 354 U.S. 942 [77 S.Ct. 1400, 1 L.Ed.2d 1537]." 32 T.C. 479, 486–487.

█ There is no single or conclusive test of whether partial liquidation distribution is essentially equivalent to a dividend. The net effect of the transaction is at least an important consideration in determining dividend equivalency. Heman v. Commissioner, 8 Cir., 283 F.2d 227, supra; Holsey v. Commissioner, 3 Cir., 258 F.2d 865, 869; United States

v. Fewell, 5 Cir., 255 F.2d 496, 499; Ferro v. Commissioner, 3 Cir., 242 F.2d 838, 841; Flanagan v. Helvering, 72 App.D.C. 46, 116 F.2d 937, 939.

Courts have emphasized that an important consideration is whether the distribution leaves the proportionate interest of the stockholders unchanged. Holsey v. Commissioner, supra; Summerfield v. United States, D.C.E.D.Mich., 145 F.Supp. 104, affirmed 6 Cir., 249 F.2d 446; Zenz v. Quinlivan, 6 Cir., 213 F.2d 914.

In the Zenz case, the buyer purchased part of taxpayer's stock. Three weeks later, as part of a plan, the corporation redeemed taxpayer's remaining stock out of accumulated earnings. The court considered the entire transaction as a whole and held:

> "[W]e are satisfied that where the taxpayer effects a redemption which completely extinguishes the taxpayer's interest in the corporation, and does not retain any beneficial interest whatever, that such transaction is not the equivalent of the distribution of a taxable dividend as to him. * * *
>
> * * * * * *
>
> "In view of the fact that the application of Section 115(g) of the Internal Revenue Code contemplates that the shareholder receiving the distribution will remain in the corporation, the circumstances of this proceeding militate against treating taxpayer's sale as a distribution of a taxable dividend." 213 F.2d 914, 917.

Volume 1, Mertens Law of Federal Income Taxation, § 9.104, states:

> "In the Zenz case the redemption actually consisted of all of the shares then owned by the shareholder. However, in a situation of this nature, it seems correct that no point should be made of the fact that the sale of part of the shares to a third person precedes rather than follows redemption of the balance. Since the two transactions are part of the same plan the order in which the sale and redemption take place should be immaterial. * * * Since, if she had sold all of her stock to a third person or if all of her stock had been redeemed by the corporation, she would have been entitled to capital gain treatment, there was no reason for a different result in the case of a sale of part of the shares and a redemption of part of the shares."

A legitimate business purpose separate from tax savings is an important but not conclusive factor to consider in determining dividend equivalence. Decker v. Commissioner, 32 T.C. 326, 331, affirmed 6 Cir., 286 F.2d 427; Smith v. United States, 130 F.Supp. 586, 591, 131 Ct.Cl. 748; Keefe v. Cote, 1 Cir., 213 F.2d 651, 655. See also Farr v. Commissioner, 24 T.C. 350, 368–69.

Tucker v. Commissioner, 8 Cir., 226 F.2d 177, bears some analogy to the problems we are considering. There we considered several interrelated transactions as one and held that where a corporate automobile dealer was required to acquire a minority stock interest in order to make the manager a majority stockholder and the corporation agreed to pay a percentage of profits to the minority stockholder for a period of years to induce him to sell his stock, the payment made to the minority stockholder of profits pursuant to the agreement did not constitute a distribution substantially equivalent to a dividend to the majority stockholder, since such payment was founded upon legitimate business considerations.

In our present case, we believe that the court was entirely justified in considering the six-step transaction set out in its findings as component parts of a plan designed to bring about the complete redemption of the Brown stock. The net effect of the redemption upon the two stockholders was very different from the distribution of a dividend. The relations of the stockholders to the corporation were very materially changed. The

result of the execution of the plan was very different from the distribution of a dividend. Instead of each shareholder retaining his pro rata interest in the company, as is the result of the usual dividend, Brown's interest in the corporation was in all respects completely terminated. Carey for the first time became a majority stockholder and Larson acquired a stock interest.

The Government does not question the fact that the plan was conceived and carried out to further a legitimate and recognized business purpose, towit, to eliminate Brown, a stockholder who could not devote adequate time to the business needs and acquire a new stockholder of proven value to the business who could devote his time to the business.

The Government has not appealed from the court's determination that the redemption of stock as to Brown was not essentially equivalent to a dividend, and as shown at footnote 2 supra, the Government has practically conceded that the redemption as to Brown was properly given capital gain treatment because of the termination of his interest in the corporation. The stock redemption as to Brown and Carey was made as a result of the same identical corporate action and for the same business purposes. If there was no pro rata distribution to Brown, there could be no pro rata distribution as to Carey. They were the only stockholders at the time of the redemption.

 The Government in oral argument made a contention that the court's first conclusion applied only to the Brown stock liquidation. When this conclusion is read as a whole, in the light of the court's findings of fact, we are satisfied that the court actually determined that the total transaction outlined in its fact findings was in essence not equivalent to a dividend within the meaning of § 302 (b) (1). Such finding is supported by substantial evidence and the Government has wholly failed to demonstrate that the court's conclusion was induced by an erroneous view of the law. When the established criteria for determining divi-

dend equivalents heretofore discussed are applied to the facts as determined by the trial court, the conclusion that the redemption when viewed at the stockholder level under § 302, is not essentially equivalent to a dividend, is not clearly erroneous.

We conclude that the court committed no error in determining that the redemption of the taxpayer's stock is not substantially equivalent to the payment of a dividend.

Affirmed.