BEATRICE LEVIN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3705-64, 6397-65. Filed December 7, 1966.

*Newton D. Brenner* and *Allen H. Duffy,* for the petitioner.
*John K. Antholis* and *Robert D. Whoriskey,* for the respondent.

SIMPSON, *Judge:* In the notices of deficiency, respondent determined deficiencies in petitioner's income tax of $1,015.22 for 1960, $1,037.74 for 1961, $970.04 for 1962, and $5,976.60 for 1963. By an amended answer in this proceeding, respondent asserted an increased deficiency of $8,642.39 for 1960; thus, the total deficiency determined for such year is $9,657.61.

The issues for decision are whether distributions in redemption of petitioner's stock were essentially equivalent to dividends, and whether the respondent erroneously determined the amount of the corporate distributions to her in 1962 and in 1963.

FINDINGS OF FACT

Some of the facts were stipulated, and those facts are so found.

The petitioner, Beatrice Levin, resided in Middletown, Conn., and filed Federal income tax returns for 1960, 1961, 1962, and 1963 with the district director of internal revenue at Hartford, Conn. Such returns were filed on a calendar year basis, using the cash method of accounting. On Schedule D of those returns, she reported long-term capital gains, in part, as follows:

| Year | Property | Gross sales price | Cost | Gain |
|------|----------|-------------------|------|------|
| 1960 | 35 Conn. Novelty | $7,000 | $3,500 | $3,500 |
| 1961 | 35 Conn. Novelty | 7,000 | 3,500 | 3,500 |
| 1962 | 35 Conn. Novelty | 7,000 | 3,500 | 3,500 |
| 1963 | 40 Conn. Novelty | 8,000 | 4,000 | 4,000 |

The respondent determined deficiencies in petitioner's income tax for 1960 and 1961, based upon his determination that the $7,000 sums received in those years were dividends. Notice of such determinations was mailed to petitioner on April 30, 1964. The respondent made a similar determination with respect to the $7,000 received in 1962 and the $8,000 reported for 1963. However, the respondent determined that the correct gross amount to be reported in 1963 was $19,000, rather than $8,000, and these determinations resulted in determinations of income tax deficiencies for 1962 and 1963. Notice of such determinations for 1962 and 1963 was mailed to petitioner on August 5, 1965. By an amended answer in this proceeding, the respondent has asserted an increased deficiency of $8,642.39 for 1960, or a total deficiency of $9,657.61, based upon the alternative contention that, if there was a sale of the stock to the corporation, the sale occurred in 1960 and the entire gain is includable in income for that year.

The Connecticut Novelty Co., Inc., began in the early 1930's as a partnership between petitioner's husband and her brother, Joseph Levine. In 1940, petitioner's husband died, and she succeeded to his interest in the business. The business was incorporated in 1948, and its outstanding shares were held as follows:

|  | Shares |
|--|--------|
| Joseph Levine | 650 |
| Beatrice Levin | 649 |
| Jerome Levin | 1 |
| Total | 1,300 |

Jerome, the petitioner's son, paid no consideration for his share. From the date of incorporation until Joseph's death on April 18, 1962, petitioner, Joseph, and Jerome constituted the board of directors

and the officers of the corporation. Thereafter, the bylaws were amended to permit nonshareholders to be directors, and Jerome's wife became a director. The petitioner held the positions of secretary and treasurer until 1959, when she limited her position to that of secretary of the corporation—a position she held throughout the taxable years in issue. Following her husband's death, Joseph lived with her and Jerome and became a second father to Jerome. Petitioner relied upon Joseph's advice in business matters.

Jerome has worked full time in the business since his graduation from high school in 1944. Initially, his activities were largely "legwork," shipping and receiving, and getting to know the customers. However, when his uncle suffered a heart attack in 1944, Jerome took on greater duties. In 1957, Jerome was 31 years old and was contemplating marriage. Therefore, he approached petitioner and his uncle demanding to know "where he stood" so that he might attempt another career while young, if necessary. It was agreed that Jerome should have a greater share in the business, and therefore, all certificates were canceled on August 1, 1957, and new shares were issued as follows:

|  | Shares |
|---|---|
| Joseph Levine | 485 |
| Beatrice Levin | 484 |
| Jerome Levin | 331 |
| Total | 1,300 |

Jerome paid no money for the acquisition of the 330 additional shares of stock.

On January 19, 1960, at a special meeting of the shareholders, it was resolved that the stock of petitioner and Joseph would be redeemed at $200 per share. Identical agreements were executed by petitioner and Joseph on that date and were accepted by Jerome on behalf of the corporation. Petitioner agreed to an immediate transfer of her shares for $96,800, payable $7,000 annually without interest beginning April 1, 1960. The agreement provided that upon default the unpaid balance should become due upon the "seller's" election, and the corporation had an option to pay the whole or part of the purchase price at any time. The contract was made binding upon the parties, their heirs, successors, and assigns.

The agreements of January 19, 1960, were entered into at Jerome's suggestion. He wanted to own the business outright and retire his uncle and mother in such a way that they would be taken care of for the rest of their lives. Jerome did not want anyone else in the business with him but retained petitioner and Joseph as directors and officers out of respect and sentiment. Petitioner and Joseph became eligible for social security benefits in 1960, but they continued to perform actual

services for the corporation and received salaries after the 1960 transaction. After the 1960 transaction, Jerome conducted the business with a greater freedom of action.

Following the 1960 redemption agreement, petitioner received two redemption payments of $7,000 cash, one in 1960 and one in 1961. In 1962 and 1963, the corporation paid petitioner by granting her credits towards the purchase price of a summer cottage in the amount of $7,000 in 1962 and $8,000 the following year, for a total purchase price of $15,000. No cash payments were made to petitioner pursuant to the redemption contract in 1962 or 1963.

The salaries and total amounts received by the shareholders from the corporation, rounded to the nearest dollar, are shown in the following table:

| Shareholder | Fiscal year ending Mar. 31— | | | | | |
|---|---|---|---|---|---|---|
| | 1958 | 1959 | 1960 | 1961 | 1962 | 1963 |
| Joseph: | | | | | | |
| Salary | $7,800 | $7,800 | $6,125 | $1,275 | $1,500 | $125 |
| Total | 7,800 | 7,800 | 6,125 | 8,275 | 8,500 | 7,125 |
| Petitioner: | | | | | | |
| Salary | 7,800 | 7,800 | 6,125 | 1,200 | 1,200 | 1,200 |
| Total | 7,800 | 7,800 | 6,125 | 8,200 | 8,200 | 8,200 |
| Jerome: | | | | | | |
| Salary | 5,200 | 5,918 | 6,950 | 8,811 | 8,518 | 14,518 |
| Total | 5,200 | 5,918 | 6,950 | 8,811 | 8,518 | 14,518 |

At the close of the fiscal year ending March 31, 1960, Connecticut Novelty Co., Inc., reported the receipt of dividend income in the amount of $1,810.74. At the close of the following fiscal year, the corporation reported dividend income of $1,776.20, $30,270.42 gross sales of securities, and an inventory of securities held for investment with a cost basis totaling $32,867.48. The corporation reported earned surplus on its tax returns as follows:

| FYE Mar. 31— | Earned surplus |
|---|---|
| 1956 | $88,017.82 |
| 1957 | 95,159.89 |
| 1958 | 96,471.74 |
| 1959 | 98,983.78 |
| 1960 | 101,261.59 |
| 1961 | 113,234.46 |
| 1962 | 114,542.28 |
| 1963 | 122,934.00 |

The corporate record book shows that the directors approved a 4-percent dividend payable each year for 1952, 1953, and 1954. Respondent admits that the corporation has paid dividends, but the record does not disclose the amount paid.

On April 2, 1962, the corporation contracted to sell a summer cottage to petitioner. This agreement provided that the purchase price of

$15,000 would be paid in two installments—one in the amount of $7,000 upon signing of the agreement and one in the amount of $8,000 on or before August 1, 1963, at which time a warranty deed would be delivered. The company acknowledged the receipt of the downpayment. It was agreed between buyer and seller that the price would be paid by having the corporation withhold payments under the 1960 redemption agreement—crediting $7,000 in 1962 and $8,000 in 1963 toward the purchase of the cottage. The corporation reported and paid Federal income tax on the gain as arising from a sale made in April of 1963. An adjusting entry made March 31, 1964, on the corporate books eliminated the real estate as a corporate asset, decreased the account payable for treasury stock, eliminated the depreciation reserve, and increased income.

The fair market value of the cottage conveyed to the petitioner was $19,000 as of April 1962.

OPINION

The determination of whether the distributions made to the petitioner from 1960 through 1963 are taxable as a dividend involves a consideration of section 302 and related sections of the Internal Revenue Code of 1954.[1] The general rule of section 301 is that any distribution to a shareholder with respect to his stock is a dividend to the extent of the corporation's earnings and profits, unless otherwise provided. Section 302(a) provides that corporate redemptions shall be treated as distributions in part or full payment for the stock if the terms of section 302(b) are met. The pertinent portion of section 302(b) states that section 302(a) "shall apply if the redemption is not essentially equivalent to a dividend." Section 302(d) states that redemptions to which section 302(a) does not apply shall be treated as distributions to which section 301 applies.

Petitioner's contention is that the distributions to her were not essentially equivalent to a dividend within the meaning of section 302(b)(1). Petitioner argues that her family relationship to the remaining shareholder is the only factor suggesting a dividend, and that there was a meaningful change in her rights of ownership and control as a shareholder resulting from the distributions. She points out that a similar cash distribution as a dividend would have passed to the shareholders in significantly different proportions.

The respondent has argued that the distributions were essentially equivalent to a dividend, stressing the fact that the attribution rules of section 318(a) apply to this case in such a manner that ownership and control was not lost by the petitioner. He further argues that

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

the distributions in question meet all of the tests judicially established for ascertaining dividend equivalency.

The tests of dividend equivalency have been stated in many Tax Court cases, and no useful purpose would be served to restate them here. See *Estate of Arthur H. Squier*, 35 T.C. 950 (1961), acq. 1961–2 C.B. 5; *Thomas G. Lewis*, 35 T.C. 71 (1960). The more important of these tests are whether there was a significant shift of ownership and control; whether there was an accumulation of earnings and profits sufficient to make the distributions; whether there was a history of significant dividend distributions; and whether the redemption was motivated by a substantial business purpose. No one test is conclusive, and the question is one of fact. *Ralph L. Humphrey*, 39 T.C. 199 (1962).

There was no reduction of petitioner's ownership interest in the corporation, because of the application of the attribution rules of section 318(a). In applying section 302(b)(1), section 302(c) provides that we use the attribution rules of section 318(a). When petitioner surrendered her 37.2 percent of the stock to the corporation and Joseph surrendered his 37.3 percent of the stock, her son became the 100-percent owner of the corporation. Under section 318(a), petitioner must be regarded as owning the shares owned by her son, and therefore, she never parted with her ownership interest in the corporation.

When petitioner's total ownership before the redemption is compared with her ownership after the redemption, it is apparent such a shift of ownership as occurred was not of the kind normally held to result in capital gains. Under normal circumstances, a sale by a shareholder of some or all of his stock results in a loss of proportionate ownership in the corporation. Just before the distribution in redemption, petitioner owned 62.7 percent of the outstanding stock—37.2 percent actually owned and 25.5 percent constructively owned. After the redemption, petitioner owned 100 percent of the outstanding stock. This curious result was brought about because before the redemption, 37.3 percent of the stock was owned by petitioner's brother, a person whose shares are not attributed to petitioner by section 318(a). When her brother's stock was redeemed at the same time as petitioner's, his and her percentage of ownership shifted to petitioner's son, a person whose stock is attributed to petitioner by section 318(a)(1)(A)(ii). Therefore, petitioner actually increased her ownership as a result of the redemptions. Such a result is most unlike a sale and is not that sort of change in ownership contemplated by the dividend equivalency test. That test seeks to discover if there has been a decrease in ownership.

The corporation had declared no dividends for 6 years before the redemption and had accumulated its earnings and profits for many years. Some dividends were paid in 1952, 1953, and 1954, but the accumulated earned surplus and undivided profits at the close of the 1956 fiscal year was $88,017.82. From the close of its 1956 fiscal year, the company added over $13,000 to its earned surplus account before the redemption in 1960. On March 31, 1961, the company had an earned surplus of over $113,000, and by the same date in 1963, over $122,000. Since much of this surplus was invested in liquid securities, it is obvious that dividends in the amount of these distributions could have been paid. It is also obvious that the distributions actually made were made from earnings and profits of the corporation.

Despite the fact that the company had been earning substantial profits for 6 years, and despite the fact that accumulated and current profits were held by it in a highly liquid state, it has not declared a dividend since 1954. The absence of dividends during a period of prosperity preceding a redemption is a fact tending to show dividend equivalency.

We have examined the record in search of a substantial business purpose for the redemption but are unable to find one. Cf. *Perry S. Lewis*, 47 T.C. 129 (1966).

The petitioner argues that there was a change in control produced by the redemption and that this change supports her contention that the distributions were not essentially equivalent to a dividend. While in form petitioner surrendered several legal rights, we find that in substance she surrendered little or nothing. She served as an officer of the corporation both before and after the redemption. Before the redemption, she received a salary of $7,800 a year from the corporation. After the redemption, she received $7,000 a year under the redemption contract and $1,200 a year salary from the corporation. In light of the record in this case, mere legal control through stock ownership appears less important than control in the sense of her ability to maintain access to corporate benefits. The normal transfer of control would alter her right and ability to share in the corporate profits; yet, we find that she is continuing to receive as much or more from the corporation after the redemption. It is difficult to find a bona fide loss of her control under these circumstances.

The petitioner's argument that her family relationship to the remaining shareholder is the only factor suggesting a dividend fails to convince us. It is now thoroughly understood that the stock attribution rules apply to section 302(b)(1), and to the extent that they do, they represent a congressional policy which makes a special case of redemptions within a family corporation. We are not in a position to change that policy. Furthermore, we have just enumerated some well-

established factors which demonstrate dividend equivalency—accumulation of profits, lack of significant dividends, absence of business purpose, and, as a result of the stock attribution rules, no decrease of ownership and control. All of these factors are present in petitioner's case, and her relationship to the corporation's sole shareholder is but one element in the determination of dividend equivalency.

The petitioner places her principal reliance upon the argument that the distributions which she received are not dividends under the "comparative-dividend" test, but we also disagree with this contention. The comparative-dividend test has been developed and applied by the Second Circuit in *Himmel* v. *Commissioner*, 338 F. 2d 815 (C.A. 2, 1964), reversing 41 T.C. 62 (1963), and *Northup* v. *United States*, 240 F. 2d 304 (C.A. 2, 1957). Under this test, a redemption is tested as to whether the distributions equal or exceed the amounts that would be received as a cash dividend.

In *Himmel*, the court found that the distributions exceeded what would have been distributed as a cash dividend; and the court thought that fact indicated the distributions were not dividends. When a distributee receives more than he would as a cash dividend, the excess is received because he is selling his rights to the stock, and thus, the receipt of the excess is indicative of a sale and not a dividend.

The case before us, however, presents a significantly different situation. If a cash dividend had been distributed in 1960, the petitioner would have received approximately 37 percent of it, or $5,180. However, if we apply the attribution rules, as we must, and figure what she would have received in the case of a cash dividend, she would have received 62 percent of $14,000, or $8,680. Instead, she received $7,000. Thus, she received more than she would have on the basis of the stock which she actually owned, but less than she would have on the basis of the stock she is treated as owning. Because of these circumstances, we think that *Himmel* is not analogous.

The *Northup* case is also distinguishable. That case involved the redemption of preferred stock. When such stock was redeemed, the holder thereof was relinquishing part of his interest in the corporation; whereas in the case before us, the petitioner is treated, by reason of the application of the attribution rules, as retaining her interest in the corporation. The *Northup* case involved taxable years subject to the Internal Revenue Code of 1939, and thus, the attribution rules of section 318 (a) were not applicable.

In addition, we believe that if one examines all the facts and circumstances of this case, they are indicative of a dividend. The corporation was in existence for 12 years before the redemption. For the first 9 years of its existence, the corporation continued to be owned and operated much like the 18-year-old partnership which preceded it. The only new owner, who was not a member of the partnership, was

Jerome, who was given one qualifying share. The corporation paid dividends in only 3 of the first 9 years of its existence. When the distributions in redemption were made, they were made to the same persons who owned the stock of the corporation for the first 9 years, and the distributions were made to them in the same proportion as they held stock during that period. Moreover, the transfer of stock which reduced petitioner's share of ownership during 3 of the 12 years that profits were accumulated was made to her son. Despite this "transfer," 3 years later we find petitioner receiving a distribution of earnings and profits in exact proportion to her ownership during most of the corporation's existence. Thus, the distributions more resembled dividends than the proceeds from the sale of stock.

If the percentage of total cash flow, both salaries and redemption distributions, is compared with the percentage of corporate ownership, the cash flow bears a striking resemblance to a dividend. Prior to the redemption, corporate salaries paid to the shareholder-officers closely approximated their prorata ownership of stock. During the year ending March 31, 1958, petitioner's salary was approximately one-fourth of 1 percent more than 37.2 percent (her percentage of ownership at that time) of the total corporate cash flow to shareholders; and for the following 1-year period, the variation from 37.2 percent was similarly inconsequential. In the year ending March 31, 1960, just prior to the redemption distributions, she received approximately 32 percent of the cash flow to shareholders. We would expect that for the year ending on March 31, 1961, the result would be quite different, because the petitioner was no longer a shareholder as a result of the redemption. Instead, we find that only her salary changed, and that she received approximately 32.4 percent of the total cash flow from the corporation to its shareholders. In the following year, she received approximately 32.5 percent of the cash flow. In other words, comparing the time during which she was a shareholder with the time during which she purportedly had severed her interests in the corporation, we find that the corporate cash flow to her changed only about 4 percent. In view of the fact that Joseph died the following year, further comparison is impossible. The total cash flow, even after the redemption, more nearly resembled the payment of a dividend than receipt of the proceeds of a sale.

In examining the agreement of January 19, 1960, we are struck by certain features which are not common in an arm's-length sale. In one aspect of the agreement, petitioner has extended $96,800 worth of credit interest-free to the corporation and has reserved no security. The company has bound itself to make $7,000 annual payments and reserved the right to make larger payments at any time. The right to make increased payments can serve no other purpose than to distribute earnings and profits, because the unpaid balance bears no interest and,

presumably, retention of liquid assets would enhance the company's earning power.

The mechanical application of the comparative-dividend test, as suggested by petitioner, would force us to close our eyes to these facts and would reduce the rules of section 302(b)(1) to a single decisive test. As yet, the weight of authority suggests that no such decisive test exists. *Kerr* v. *Commissioner*, 326 F. 2d 225, 230 (C.A. 9, 1964), affirming 38 T.C. 723 (1962), certiorari denied 377 U.S. 963 (1964); *Bradbury* v. *Commissioner*, 298 F. 2d 111 (C.A. 1, 1962), affirming a Memorandum Opinion of this Court; *United States* v. *Carey*, 289 F. 2d 531, 537 (C.A. 8, 1961); *United States* v. *Fewell*, 255 F. 2d 496, 500 (C.A. 5, 1958); *Flanagan* v. *Helvering*, 116 F. 2d 937, 939 (C.A.D.C. 1940), affirming a Memorandum Opinion of this Court. Furthermore, if we relied solely upon the comparative-dividend test, we would not make the factual inquiry which was contemplated by Congress when it enacted section 302(b)(1).[2]

In light of the record as a whole, we find that the petitioner has failed to show that the distributions to her from 1960 through 1963 were not essentially equivalent to a dividend within the meaning of section 302(b)(1).

The next issue to be resolved is the amount of the dividends received by petitioner in the years 1962 and 1963. The problem is created by the fact that petitioner received a summer cottage in 1962 which, she claims, was paid for by offsetting the payments that she would otherwise have received in 1962 and 1963 under the redemption plan.

We agree with the petitioner that the transfer of the cottage was intended to be in lieu of the corporate distributions and reject the respondent's alternative theory that it was a dividend in 1963 only. The contract of sale between the corporation and petitioner called for a $7,000 payment in 1962, which sum corresponds to the amount due to petitioner under the redemption agreement. We have found as a fact from Jerome's testimony that the parties orally agreed that cash would not change hands in 1962, and that the amount due the petitioner under the redemption agreement would be credited against her obligation to pay for the property. Jerome's testimony was uncontradicted and believable. The conduct of the parties in executing the deed in 1963 and adhering to the terms of the contract by making no cash distributions to petitioner during those years supports his testimony. We therefore find that the amount of the dividend distribution in 1962 was $7,000.

In order to decide how much was distributed to petitioner in 1963, we must ascertain the fair market value of the summer cottage. Since

---

[2] The Senate Finance Committee has stated that its intent was to make the test of sec. 302(b)(1) dependent upon a factual inquiry into whether or not the transaction may properly be characterized as a sale of stock to the corporation. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 233 (1954).

we have found that petitioner received $7,000 in 1962 toward the purchase of the cottage, any excess in value over $7,000 was received by her in 1963 when the deed to the property was delivered.

Petitioner contended that the value of the summer cottage was $15,000 in 1962, the year the contract of sale was made. Respondent determined that the value of the cottage at such time was $19,000.

The question is essentially one of fact and the petitioner has the burden of proving the respondent's determination to be erroneous. Each party has presented some evidence supporting his valuation of the summer cottage, and on the whole, respondent has presented the stronger case. The respondent's expert witnesses fully explained the basis upon which they arrived at appraisals which supported the respondent's determination of fair market value. In addition, they pointed out why other sales, relied upon by the petitioner, were not comparable. In contrast, the petitioner offered only an unsupported letter from his insurance agent whose letterhead indicates that he is also a real estate appraiser. The valuations determined by the respondent's witnesses appear to be more indicative of the value of the summer cottage acquired by the petitioner. Upon the basis of this record, we find that petitioner has failed to carry her burden of proof. Accordingly, we hold that the fair market value of the summer cottage was $19,000 and that the corporate distribution to her was $12,000 in 1963.

In view of our disposition of the foregoing issues, it is unnecessary to consider the respondent's alternative theory that the entire gain from the disposition of petitioner's stock is taxable in 1960.

In one paragraph of her brief, petitioner has suggested that section 302 is an unconstitutional tax on gross receipts, in that it does not allow a tax-free recovery of her capital investment. The petition in this proceeding makes no reference to the constitutionality of section 302, nor does it allege that any provision of the Federal Constitution has been violated. It is well settled that such a serious issue may only be raised by specific pleading. *Antoinette M. Faraco*, 29 T.C. 674 (1958), affd. 261 F. 2d 387 (C.A. 4, 1958), certiorari denied 359 U.S. 925 (1959); *Muriel Dodge Neeman*, 13 T.C. 397 (1949), affirmed per curiam 200 F. 2d 560 (C.A. 2, 1952), certiorari denied 345 U.S. 956 (1953); *Frederick N. Dillon*, 20 B.T.A. 690 (1930). Therefore, we do not consider the issue as properly raised. Had the issue been properly before us, its disposition might have been governed by our opinion in *Thomas Kerr*, 38 T.C. 723 (1962), affd. 326 F. 2d 225 (C.A. 9, 1964), certiorari denied 377 U.S. 963 (1964).

Accordingly,

*Decision will be entered under Rule 50.*